**UNITED STATES of America**

v.

**Vincent M. FERRARA, et al.**

**Crim. No. 89–289–WF.**

United States District Court, D. Massachusetts.

April 15, 1991.

Corrected June 27, 1991.

Jeffrey Auerhahn, Asst. U.S. Atty., Boston, Mass., for U.S.

James J. Cipoletta, Revere, Mass., Elliot M. Weinstein, Boston, Mass., Henry D. Katz, Chelsea, Mass., Anthony M. Cardinale, Bernard Grossberg, Boston, Mass., John F. Cicilline, Providence, R.I., Martin G. Weinberg, Boston, Mass., Oscar Goodman, Las Vegas, Nev., Robert L. Sheketoff, Joseph J. Balliro, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. *Summary*

The seven defendants [1] in this case are charged with being members of the Patriarca Family of La Cosa Nostra ("LCN" or "Mafia"). It is alleged that the Patriarca Family is a criminal organization as defined

---

1. The defendants are Raymond J. Patriarca, the alleged "Boss" of the Family; Joseph A. Russo, the alleged "Consigliere" or "Counselor" and acting "Underboss;" Vincent Ferrara and Robert Carrozza, alleged "Capo Regimes" or "Captains;" Carmen Tortora, an alleged "Soldier;" and Dennis Lepore and Pasquale Barone, alleged "Associates" of members of the Patriarca family.

in the Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961 *et seq.* (1988). The Superceding Indictment charges that the Patriarca Family is a highly secret enterprise whose illegal activities have included specified murders, drug trafficking, extortion, obstruction of justice, and gambling, among other things.

Significant evidence of the existence of the illegal enterprise alleged in this case was obtained by the government when—apparently for the first time anywhere—it electronically intercepted and recorded a meeting on October 29, 1989, at 34 Guild Street, Medford, Massachusetts in which new members of the LCN were inducted. As part of the ceremony, the new members: swore their life-long, paramount loyalty to the LCN and acknowledged that only death would end their membership; promised not to divulge the existence or secrets of the LCN; and undertook to kill informants, including their blood relatives, if instructed to do so.

The electronic surveillance at 34 Guild Street was conducted pursuant to a warrant issued on the evening of October 27, 1989, (the "Order" or the "Warrant"), by Judge David Nelson of the United States District Court for the District of Massachusetts. *See* Appendix 1 hereto. The Warrant was issued on the basis of an application filed by then Special Attorney Diane Kottmyer (the "Application") and a supporting affidavit of Special Agent Walter J. Steffens, Jr. (the "Steffens Aff.") of the Federal Bureau of Investigation ("FBI"). The Order authorized roving electronic surveillance to intercept certain criminal communications involving Joseph Russo, Vincent Ferrara, or Robert Carrozza.

The Warrant was issued pursuant to 18 U.S.C. § 2518(11)(a), a relatively new provision of the federal statute authorizing the interception of communications. *See* The Wire and Electronic Communications Interception and Interception of Oral Communications Act, 18 U.S.C. § 2510 *et seq.* (1988) ("Title III").[2] Title III was enacted in

1968, after the Supreme Court, reversing its prior precedent, explicitly held that the protections of the Fourth Amendment applied to the interception of wire and oral communications. *See* section III.3 *infra.* The statute was intended to codify the requirements of the Fourth Amendment as it was then understood to apply to the interception of communications, to supplement the Fourth Amendment's protections with solely statutory safeguards and procedures, and to facilitate the interception of criminal conversations in appropriate investigations—particularly including investigations of organized crime.

The Fourth Amendment requires that searches and seizures be reasonable and establishes certain requirements for the issuance of warrants. Among these is the requirement that any warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As originally enacted, Title III implemented the particularity clauses of the Fourth Amendment by requiring: (1) that each application concerning electronic surveillance include "a particular description of ... the place where the communication is to be intercepted," 18 U.S.C. § 2518(1)(b)(ii), and (2) that the judge find that "the place where, ... communications are to be intercepted [is] being used, or [is] about to be used," in the commission of a specified offense, § 2518(3)(d).

In enacting Title III, Congress expressed the belief that electronic surveillance was indispensable to investigating and prosecuting organized crime. Subsequently, many cases in Massachusetts and elsewhere showed this conviction to be correct. As the ability of the government to intercept criminal conversations became manifest, however, sophisticated criminals began structuring their communications to frustrate efforts to intercept them.

In recognition of this, Title III was amended in 1986 to add "roving intercept" and "roving wiretap" provisions, 18 U.S.C.

**2.** The text of § 2518(11) and the provisions of Title III which it modifies, subsections (1)(b)(ii)

and (3)(d), is set forth in Appendix 2 hereto.

§ 2518(11) (1988). With regard to the roving intercept provision at issue in the instant case, subsection 11 provides that the usual particularity requirements of Title III, § 2518(1)(b)(ii) and (3)(d), do not apply if a judge finds such specification is not practical, based upon an application by the government containing:

a full and complete statement as to why such specification is not practical and identif[ying] the person committing the offense and whose communications are to be intercepted.

§ 2518(11)(a)(ii).

In essence, the roving intercept provision replaces the usual practice that the place to be searched be identified in a warrant by an address with a description of that place as the location at which an identified person is engaging in identified criminal conversation. Thus, a roving intercept order gives executing officers less specific direction, and more discretion, concerning the place to be searched than a conventional warrant. Section 2518(11)(a) reflects the contemporary view of Congress and the President that this increased discretion is constitutionally permissible and appropriate when it is impractical for a warrant to define the place to be searched in conventional terms, particularly if that impracticality is caused by the deliberate efforts of suspects to frustrate surveillance.

At the outset of this case the defendants moved to suppress the evidence intercepted at 34 Guild Street on the ground that the roving intercept provision of Title III violates the particularity clause of the Fourth Amendment and is, therefore, unconstitutional. The government opposed this motion, which presents issues which have not been decided previously by any court.

The court began oral argument on defendants' motion on February 22, 1991. At that time neither the defendants nor the court were aware that the government had, prior to obtaining the Order in this case, developed information concerning 34 Guild Street as the possible site of an imminent Mafia induction ceremony, but did not include that information in the Application or Steffens' Affidavit furnished to Judge Nel-

son. In response to an invitation by the court to clarify what, if anything, it knew about 34 Guild Street before issuance of the Warrant, the government filed several affidavits.

Those affidavits indicated that on October 27, 1989, the government's investigation developed several pieces of information indicating that 34 Guild Street would be used two days later for a Mafia induction ceremony. Thus, by that afternoon, there was evidence sufficient to provide probable cause to believe it would soon be possible and proper to intercept conversations at 34 Guild Street. At the same time the government also had formidable reasons to doubt that they had identified the true location of an imminent Mafia induction ceremony and considerable evidence that the proposed targets of the proposed roving Order were still attempting to thwart surveillance.

Disclosure of the foregoing facts concerning 34 Guild Street caused defendants to supplement their motion to suppress to claim additional statutory as well as constitutional grounds for exclusion of the evidence at issue. Oral arguments on the continually emerging legal issues were held on February 22, 1991, February 26, 1991, February 27, 1991, March 6, 1991, March 14, 1991 and March 25, 1991. On March 25, 1991, defense counsel were permitted to interrogate Kottmyer on the reasons why she did not on October 27, 1989 revise or supplement the government's submission to provide Judge Nelson with the information the FBI had recently developed regarding 34 Guild Street.

Upon consideration of the evidence, the parties' voluminous memoranda, and analysis of the applicable law, the court now concludes the motion to suppress must be denied. In view of the complexity of the issues presented, and of their importance to all parties, the reasons for this decision are explained in detail in this Memorandum. Briefly summarized, these reasons are as follows.

The constitutionality of the roving intercept provisions now at issue must be analyzed as they were implemented by the

Order issued by Judge Nelson. *See* section III.1 *infra.*

In addition, the question whether § 2518(11), as applied in this case, violates the Fourth Amendment requires consideration of the origins of the Amendment and its evolution, particularly as it has been construed concerning electronic surveillance. *See* section III.2 *infra.* The Fourth Amendment was a direct response to the general warrants and writs of assistance which gave colonial officials virtually boundless discretion as to where they could search and who or what they could seize. The Amendment was originally enacted to protect individuals and their tangible property from unreasonable searches and seizures.

This protection against unreasonable searches and seizures was afforded by the operation of a series of related provisions of the Fourth Amendment. These provisions include the requirements that, absent special circumstances, searches be conducted pursuant to warrants issued by neutral magistrates, based upon demonstrated probable cause to believe criminal activity is involved, and specifically describing— and thus limiting—the place(s) to be searched and the property to be seized.

When it first confronted the issue in 1928, the Supreme Court did not construe the Fourth Amendment to protect oral or wire communications, which are intangible and were not deemed to be within the literal scope of the Amendment's protection of "persons, houses, papers and effects." In 1967, however, the Supreme Court interpreted the Fourth Amendment to protect conversations. Title III was enacted in response to the Supreme Court's revised interpretation of the Fourth Amendment as it applied to the interception of communications.

The Supreme Court's departure from the traditional, literal application of the Fourth Amendment concerning electronic surveil-

lance paralleled a more functional interpretation of the Amendment in other contexts as well. Thus, at least since 1967, the Supreme Court has increasingly focused on the reasonableness of the search or seizure at issue. At the same time, the Court has relaxed literal requirements of the Fourth Amendment—or traditional interpretations of those requirements—when it has found a search or seizure to be reasonable and has been convinced that it would be impractical to interpret those requirements more rigorously without failing to recognize the legitimate needs of law enforcement. In such cases, the Court has indicated that the use of unconventional forms of warrants are permissible and appropriate when departures from the usual terms of a search warrant are, as a practical matter, necessary to the viability of prior judicial approval of a search and significant special circumstances justify relaxation of the usual requirements. Indeed, the Supreme Court has, in the absence of traditional exigent circumstances, recently approved searches and seizures without warrants or probable cause on the basis that special needs rendered such conduct reasonable.

This court is persuaded that viewed in the current context of Fourth Amendment jurisprudence, the roving intercept provision of Title III, § 2518(11)(a), is constitutional as applied in this case. This conclusion is consistent with the sole decision addressing the constitutionality of the similar—but not identical—roving wiretap provision of Title III, § 2518(11)(b). *See United States v. Silberman,* 732 F.Supp. 1057 (S.D.Cal.1990).[3]

In addition, the judicially crafted exclusionary rule relating to Fourth Amendment violations applies to the execution of the roving intercept Order in this case. *See* sections III.6 and IV.1, *infra.* This exclusionary rule now includes an exception for objectively reasonable reliance by a law enforcement officer upon a statute, or upon a warrant if it has been properly obtained.

---

**3.** Two law review articles also address the constitutionality of the roving intercept and wiretap provisions of Title III. *See* Fishman, *Interception of Communications in Exigent Circumstances: The Fourth Amendment, Federal Legis-* *lation, and the United States Department of Justice,* 22 Ga.L.Rev. 1, 65 (1987); Goldsmith, *Eavesdropping Reform: The Legality of Roving Surveillance,* 1987 U.Ill.L.Rev. 401.

In the instant case, the agents reasonably relied on the validity of the roving intercept provisions of Title III and the Warrant issued pursuant to those provisions. Therefore, if the manner in which the Warrant was obtained does not require suppression, the good faith exception to the exclusionary rule would operate to defeat defendants' motion to suppress the evidence of the LCN induction ceremony even if the roving intercept provision of Title III were now deemed unconstitutional.

■ With regard to suppression for violations of Title III, there are now several distinct exclusionary rules which apply to different sections of the statute. *See* Section IV.1 *infra*. The provisions of Title III which were intended to enact requirements of the Fourth Amendment are subject to judicially fashioned and evolving constitutional exclusionary rules; these rules include the standards enunciated by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The provisions of Title III which are legislated supplements to the requirements of the Fourth Amendment are subject to the more static exclusionary provisions of the statute, §§ 2515 and 2518(10). A violation of an obligation created solely by Title III does not justify suppression if: (1) the section of the statute at issue does not play a "central" role in guarding against the unwarranted use of wiretapping or electronic surveillance; and (2) the error was inadvertent, rather than part of a deliberate effort to mislead the court, or made in reckless disregard of the government's obligations.

In this case, the court concludes that the government erred in not telling Judge Nelson on October 27, 1989, of the information it had developed regarding 34 Guild Street as the possible site for an imminent Mafia induction ceremony. The failure to provide this information constituted a violation of the requirement of § 2518(11)(a)(ii) that the government provide a full and complete statement of why it was, in the government's view, impractical to identify a place to be bugged in conventional terms. Subsection (11) modifies other provisions of Title III which are rooted in the particularity clause of the Fourth Amendment. Thus, consistent with the relevant precedents of the First Circuit in Title III cases involving issues concerning applications for a warrant, the judicially crafted exclusionary rules—particularly including the standards of *Franks*—must be applied to determine whether suppression is the proper remedy for the violation of subsection (11)(a)(ii) in this case.

*Franks* directly addressed the circumstances in which evidence should be suppressed if it were alleged that the government had presented false information in an affidavit to persuade a judge that there was probable cause for the issuance of a warrant. In *Franks*, the Court held that:

> In the event that ... the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156, 98 S.Ct. at 2676. The Court, therefore, established that when *Franks* applies a defendant must satisfy two requirements to obtain suppression based upon possible governmental misconduct in connection with obtaining a warrant: first, that the information at issue was known by the government to be false or was presented with reckless disregard for its truth; *and* second, that the information was essential to the issuance of the warrant. These standards also apply when information has been omitted from an application or affidavit.

Suppression for the violation of § 2518(11)(a)(ii) is not proper in this case because neither of the prongs of the *Franks* test has been satisfied. As described in detail in this Memorandum, the court is convinced that Kottmyer acted in complete good faith, without any intention to mislead or obtain any tactical advantage, when she failed to provide Judge Nelson

with the information obtained on October 27, 1989 concerning 34 Guild Street. *See* sections II and IV.2.

In addition, Kottmyer's error was not made in reckless disregard for the truth or for the government's other obligations to the court. As of October 27, 1989, there were no cases construing § 2518(11)(a)(ii). At that time, it was objectively reasonable for Kottmyer to believe, mistakenly, that the roving intercept provision, § 2518(11)(a)(ii), which requires a showing of impracticality, was synonymous with the roving wiretap provision, § 2518(11)(b)(ii), which followed it. The roving wiretap provision requires only a showing that a proposed target is seeking to thwart surveillance. The information the government had just obtained concerning the possible use of a residence at 34 Guild Street for a Mafia induction ceremony tended to strengthen a showing that Russo, Carrozza and Ferrara, who had no prior connection to that address, were attempting to evade surveillance. Given the ambiguity of the law and the pace and pressure under which decisions had to be made on the afternoon of October 27, 1989, it was not reckless for the government to make the error which the court, after intense and prolonged examination, now finds.

In addition, suppression is not justified because if a reasonable judge had been fully informed regarding 34 Guild Street, he or she would nevertheless have authorized electronic surveillance at that address, either by signing the proposed Order authorizing the roving interception in its original form or by amending it to add express authorization for 34 Guild Street, as well as other, unspecified locations.

Accordingly, as the standards for exclusion established by *Franks* have not been satisfied, suppression is not a proper remedy for the violation of § 2518(11)(a)(ii) in this case.

Nor is suppression justified on the basis of any of defendants' other claims. Contrary to defendants' contention, § 2518(1)(c), the "necessity" provision of Title III, did not require the government to address in its Application electronic surveil-lance concerning Gaetano Milano and Nicholas Bianco, who were under investigation for some of the same crimes as Russo, Ferrara and Carrozza. *See* section IV.3 *infra*. More specifically, § 2518(1)(c) only requires disclosures concerning the efficacy of non-Title III investigative techniques. Moreover, as this necessity provision is rooted in the Fourth Amendment's requirement of reasonableness, a violation would justify suppression only if the standards of *Franks* were met. Once again, the court is persuaded that even if § (1)(c) is deemed to have been violated in this case, neither of the requirements for suppression under *Franks* has been satisfied.

The defendants correctly contend that, pursuant to § 2518(1)(e), the Application should have disclosed prior applications for electronic surveillance of all of the individuals named in the Application, rather than just for the three individuals designated as "principals." *See* section IV.4 *infra*. Subsection (1)(e), however, is a statutory addition to the requirements of the Fourth Amendment. It has, in this district and in other Circuits, been properly characterized as a "non-central" provision of Title III. Thus, where, as here, a violation is inadvertent rather than deliberate or in reckless disregard of the government's obligations, suppression is not justified.

Finally, even if the government could have properly obtained a roving intercept Order for Patriarca or his similarly situated co-defendants, it was not improper for the government to intercept their communications with Russo, Ferrara or Carrozza pursuant to the Order targeting those three individuals only. *See* section IV.5 *infra*. Subsection (11)(a)(ii) is intended to prevent investigators from using a roving intercept order as authority to intercept communications if at least one of the participants is not identified as a target in the order; it is not intended to preclude interception of incriminating conversations involving a target identified in a roving warrant and other individuals.

Defendants' remaining contentions challenge the interception of communications at 34 Guild Street on more conventional

grounds, such as minimization. These claims are not now ripe for resolution. They will be addressed in subsequent proceedings and decisions.

Accordingly, for the reasons amplified in the following findings of fact and analysis, defendants' motion to suppress the communications intercepted at 34 Guild Street must be denied.

## II. *The Facts*

■ The following facts are derived primarily from the Application and the Steffens' Affidavit submitted to obtain the Warrant in this case, the four affidavits submitted by the government in opposing defendants' request for testimony in connection with the motion to suppress, the March 25, 1991 testimony of Kottmyer, which was subject to searching cross examination, and the court's assessment of her credibility.

This case arises out of the Department of Justice's continuing investigations of the alleged Patriarca Family of La Cosa Nostra. In the mid–1980s, the government successfully prosecuted numerous individuals charged with being co-conspirators in a enterprise known as the Patriarca Family of the LCN. *See United States v. Angiulo*, 897 F.2d 1169 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Zannino*, 895 F.2d 1 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *United States v. Angiulo*, 847 F.2d 956 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Cintolo*, 818 F.2d 980 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987). Much of the evidence used to obtain those convictions resulted from the electronic surveillance of 98 Prince Street, Boston, the regular headquarters of Gennaro Angiulo, an "Underboss" of the Patriarca family, and of 51 North Margin Street, Boston, the regular site of certain high stakes poker games. *See Angiulo*, 847 F.2d at 960; *Zannino*, 895 F.2d at 3; *Cintolo*, 818 F.2d at 983–84.

The convictions obtained in the foregoing cases resulted in the incarceration of many of those believed by the government to have been the leaders of the Patriarca Family. However, the government's investigation of the Patriarca Family continued.

In the summer of 1989, the FBI was receiving information about a power struggle within the Patriarca Family. Steffens Aff. p. 14; Affidavit of former Special Agent James A. Ring, dated February 25, 1991, ¶ 3(a) ("Ring Aff."). In June, 1989, alleged Patriarca Family "Underboss" William Grasso was discovered murdered in Connecticut. Ring Aff. ¶ 3(b). Francis Salemme, an alleged Patriarca Family "soldier," was shot the same day. *Id.* Information available to the FBI indicated that the potential for further violence within the Patriarca Family escalated after these events. *Id.* ¶ 3(d).

At the same time, the FBI was receiving information that new members might soon be inducted into the Patriarca Family. *Id.* ¶ 3(e). Among those viewed by the FBI as possible candidates for induction was Vincent Federico. *Id.* ¶ 3(f). Federico, who was then serving a Massachusetts sentence for murder, was considered by the FBI to be a close associate and potential gunman for Ferrara. *Id.*

During the summer of 1989, the government also had information that various purported members of the Patriarca Family, including Joseph Russo, Vincent Ferrara, and Robert Carrozza, were suspicious that efforts were being made to intercept their communications. Steffens Aff. p. 56–66. Therefore, these individuals, among others, arranged to communicate in varying places which would be both difficult to predict and to subject to electronic surveillance. *Id.* In early July, 1989, Steffens began preparing an affidavit to document the efforts of Russo, Ferrara, and Carrozza to thwart efforts to intercept their conversations in anticipation of seeking authorization to conduct roving electronic surveillance of those individuals. Supplemental Affidavit of Diane M. Kottmyer, Assistant United States Attorney, dated March 6, 1991, ¶ 2 ("Kottmyer Supp.Aff.").

By October 20, 1989, the government believed an induction ceremony might take

place in the next few weeks. Ring Aff. ¶ 3(g). Because of this information, among other things, a decision was made to seek a warrant authorizing roving electronic surveillance of Russo, Ferrara, and Carrozza. *Id.* ¶ 3(i). The government also decided to seek a similar warrant in Rhode Island concerning Nicholas Bianco, another alleged Patriarca Family member. Kottmyer Supp.Aff. ¶ 3.

In October, 1989, the Department of Justice had an established procedure for obtaining authorization to apply for a judicial warrant to conduct electronic surveillance pursuant to Title III. *Id.* ¶ 5. This procedure required consultation with the appropriate United States Attorney; submission to Department of Justice headquarters in Washington, D.C. of a proposed application, affidavit, and order; review at headquarters and revisions if suggested by such review; and the approval of the Attorney General or his designee. *Id.* This process usually took about two weeks. *Id.* at ¶ 6. It could, however, be expedited. *Id.* Indeed, the United States Attorney's Manual stated, in pertinent part, that "in emergency situations, or otherwise where time [was] of the essence," materials could be faxed from the field to headquarters. United States Attorney's Manual, ¶ 9–7.113.

In this case, on the morning of Tuesday, October 24, 1989, the necessary papers, including the proposed Application and Steffens' Affidavit, were hand-delivered to the Department of Justice as part of an effort to obtain expedited authorization to apply to the court for a roving intercept order targeted at Russo, Ferrara, and Carrozza. Ring Aff. ¶ 3(h).

Steffens' Affidavit detailed considerable information indicating that Russo, Ferrara, and Carrozza, among others, were very concerned about being subject to electronic surveillance and were structuring their communications to frustrate any effort to intercept them. Steffens Aff. pp. 13–66. This information came from confidential informants, visual surveillance, and tape recordings made in an earlier undercover operation. *Id.* The affidavit indicated that the proposed targets of the roving intercept attempted to frustrate possible electronic surveillance by not discussing criminal activity on the telephone, not using any site regularly for such discussions, and by often meeting outdoors.

Steffens' Affidavit also described in considerable detail some—but not all—of the information known to the government which indicated that there was probable cause to believe the principals to be targeted had engaged in murder, as well as other illegal activity, on behalf of the Patriarca Family and that the proposed roving electronic surveillance was necessary and appropriate to the investigation of their past and continuing criminal conduct. For example, Steffens' Affidavit included detailed information concerning the targets' possible involvement with the shootings of Grasso and Salemme, Steffens Aff. pp. 13–47, and interstate travel in furtherance of illegal gambling, Steffens Aff. pp. 47–56. Steffens' Affidavit made no mention, however, of the possible Mafia induction ceremony which had significantly influenced the decision to seek judicial approval to conduct roving interceptions of Russo, Ferrara, and Carrozza.

The omission from Steffens' Affidavit of any reference to a possible Mafia induction ceremony was deliberate. Second Supplemental Affidavit of Diane M. Kottmyer, Assistant United States Attorney, dated March 18, 1991 ¶¶ 1, 2 ("Kottmyer Second Supp.Aff."). At the time the affidavit was submitted to the Department of Justice, Kottmyer believed that there was sufficient information to establish the probable cause that criminal conversations would be captured, which is required to obtain a warrant, without relying upon the information concerning the possible induction ceremony. *Id.* ¶ 2. The government was concerned, however, that if communications were intercepted and Steffens' Affidavit was furnished to members of the Patriarca Family, any information it contained relating to a possible induction ceremony might be valuable in their ongoing effort to identify informants. *Id.* ¶ 1. The government then had valid reasons to believe that the Patriarca Family had historically been will-

ing to use violence and other illegal means to obstruct investigations and prosecutions. *See, e.g., Angiulo,* 847 F.2d at 961–62; *Cintolo,* 818 F.2d at 980; *United States v. DiGiacomo,* 746 F.Supp. 1176, 1186 (D.Mass.1990). Thus, the government was anxious not to jeopardize the safety of its informants by unnecessarily compromising their confidentiality. Kottmyer Second Supp.Aff. ¶ 2.

At the time the government decided not to mention the possible Mafia induction ceremony in Steffens' Affidavit, it had no information concerning the site for any such ceremony. Ring Aff. ¶ 3(i); Testimony of Diane Kottmyer on March 25, 1991 ("Tr.") at 31, 37. Thus, the information omitted was initially relevant to whether the probable cause requirements of Title III were satisfied, but did not then relate to the special question raised by a request for a roving intercept—whether it was practical to specify the place to be bugged if a warrant issued.

On Thursday, October 26, 1989, however, the FBI learned that a ceremony to induct new members into the LCN would take place on Sunday, October 29, 1989. Ring Aff. ¶ 3(i); Tr. at 63, 64, 103. One source said the ceremony would occur at 11:00 a.m., near Wellington Circle in Medford, Massachusetts. Ring Aff. ¶ 3(i); Tr. at 63, 64, 103.

Suspecting that any induction ceremony might include making Federico a member of the LCN, later that day the FBI contacted the Massachusetts Department of Corrections and, as it had done in the past, inquired about Federico's status. Ring Aff. ¶ 3(j). The FBI was informed that Federico had applied for a 28 hour furlough, beginning on the morning of Sunday, October 29, 1989. *Id.* The FBI did not seek to influence whether Federico's request for a furlough would be granted. *Id.*

On the morning of Friday, October 27, 1989, Kottmyer had delivered to Judge Nelson copies of her Application, Steffens' Affidavit and a proposed Order, which the Department of Justice had not yet approved for formal submission. Kottmyer

Supp.Aff. ¶ 7; Tr. at 37. As Judge Nelson was told, the documents were furnished for his review in anticipation of Department of Justice approval later that day. Kottmyer Supp.Aff. ¶ 7.

Also on the morning of Friday, October 27, 1989, the FBI obtained Federico's furlough application. Ring Aff. ¶ 3(k). The application stated that Federico intended to be at his sister's residence at 34 Guild Street, Medford, Massachusetts on Sunday, October 29, 1990, from 11:30 a.m. to 2:30 p.m. *Id.* The FBI was not previously aware of the 34 Guild Street address as a potential site for the roving electronic surveillance. *Id.;* Tr. at 74, 79, 134.

The FBI promptly placed 34 Guild Street under observation, in part from the home of an FBI agent who lived on Guild Street. Ring Aff. ¶ 3(1); Tr. at 74, 78–79, 147. At about 12:53 p.m. on October 27, 1989, Russo, Ferrara and Angelo Mercurio, another alleged member of the Patriarca Family, were observed driving away from 34 Guild Street in a vehicle later identified as belonging to Federico's brother-in-law, Stephan DiStefano, who resided at 34 Guild Street. Ring Aff. ¶ 3(1).; Tr. at 80–82, 149.

The information concerning 34 Guild Street which the FBI had acquired on Friday, October 27, 1989, was communicated to Kottmyer before Department of Justice approval of the Application for a roving intercept order was received. By 1:00 p.m., there was probable cause to believe that on October 29, 1989, the residence at 34 Guild Street would be used for the induction of new members into the Patriarca Family and for the discussion of criminal activity. Thus, it was then possible to specify one location which there was probable cause to believe was about to be used in connection with the conduct of an illegal RICO enterprise and at which communications could be intercepted pursuant to a warrant authorizing electronic surveillance.

At the same time, the information in Steffens' Affidavit concerning the efforts of Russo, Ferrara, and Carrozza, among others, to evade electronic surveillance demonstrated that there was a significant risk that 34 Guild Street would not actually

be used for the anticipated induction ceremony. Steffens Aff. pp. 56–66. More specifically, as the Affidavit amply indicated, the targets of the proposed roving interception order had shown a tendency to arrange their conversations to frustrate any efforts to intercept them. Ring Aff. ¶ 3(o). The FBI believed that the inherent possibility of a late change in location was enhanced by the sensitivity to security which the LCN would attach to an induction ceremony. *Id.* The FBI was also concerned that inaccurate information concerning an induction ceremony might have been disseminated as part of an LCN effort to identify informants. *Id.* Thus, the FBI was skeptical that 34 Guild Street would prove to be the location of a Mafia induction ceremony. *Id.* at ¶ 3(o).

In addition, while the government on October 27, 1989, had developed probable cause to believe that 34 Guild Street would soon be used once for a LCN induction ceremony, the conduct described in Steffens' Affidavit, among other things, provided valid reasons for the FBI to believe Russo, Ferrara, and Carrozza would continue to use various other, changing locations to discuss criminal activity.

The government did not revise the proposed Application, Affidavit, and Order it had provided Judge Nelson for his review that morning. It would not, however, have been impossible or impractical to do so.

Rather, the Department of Justice faxed its approval of the original application and associated documents to Kottmyer at 6:11 p.m. on Friday, October 27, 1989. Kottmyer Supp.Aff. ¶ 6. Kottmyer and Steffens promptly met with Judge Nelson. *Id.* ¶ 8. In the judge's presence, Kottmyer signed the Application previously furnished and Steffens, under oath, signed his Affidavit in its original form. *Id.*

The Application and Steffens' Affidavit disclosed prior applications for electronic surveillance concerning the principals targeted by the request for a roving intercept order—Russo, Ferrara, and Carrozza. The submissions did not, however, provide such information for other individuals who the government said it had probable cause to

believe were engaged in the enumerated offenses, but did not identify as being expected to be overheard if the Order issued. Application ¶¶ 5 and 6; *see also* Section IV.4, *infra,* amplifying these facts. Kottmyer limited the disclosure of prior applications for electronic surveillance to the three principals because she, in good faith, reasonably but erroneously believed this was all that was legally required. Kottmyer Aff. ¶¶ 4, 6.

The Application and Steffens' Affidavit also did not disclose that essentially the same information they contained had recently been used to obtain a warrant from a district judge in Springfield, Massachusetts for electronic surveillance of the automobile of Gaetano Milano, another alleged member of the Patriarca Family being investigated in connection with many of the same crimes as Russo, Ferrara, and Carrozza, including the Grasso murder. Nor did the government inform Judge Nelson that an authorization for a roving intercept was being simultaneously sought in Rhode Island to investigate Bianco's involvement in the same matters. These matters were not mentioned because Kottmyer, correctly and in good faith, did not believe their disclosure to be required. Kottmyer Supp. Aff. ¶ 10; *see also* section IV.3, *infra,* amplifying these facts. In any event, neither the Milano nor Bianco orders resulted in any interceptions. Kottmyer Supp.Aff. ¶ 11.

More significantly, however, the Application and Affidavit executed before Judge Nelson on October 27, 1989 still made no mention of the possibility of intercepting an LCN induction ceremony or of the information obtained that day concerning 34 Guild Street as the intended location for that event. Thus, the documents submitted to obtain judicial approval for the roving intercept did not contain "a full and complete statement" as to why it was, in the government's view, not practical to specify the place where oral communications would be intercepted pursuant to the warrant being sought. Indeed, at the time Steffens' Affidavit was signed, it was a misstatement for him to continue to assert that "[s]pecifica-

tion of *the* location where such communications are to be intercepted is not practical because, as set forth in Part IV *infra* [Russo, Ferrara, Carrozza] and their associates use various and changing meeting places in the District of Massachusetts with intent to avoid the oral interceptions of those meetings." Steffens Aff. ¶ 4(g), p. 6 (emphasis added). Similarly, it was incorrect for Steffens to continue to state that "the extraordinary technique of electronic surveillance of a specific location or telephone is not available in this instance due to the techniques, described in this affidavit, that the targets have employed to thwart such coverage." *Id.* ¶ 74(g). These misstatements in Steffens' Affidavit were not corrected.

Kottmyer did, however, tell Judge Nelson that interceptions might take place that weekend and that, as contemplated by the proposed Order she had submitted, he would be notified in advance, if possible, of any surreptitious entry made in execution of his Order. Kottmyer Supp.Aff. ¶ 8; Tr. at 95, 108–112; Steffens 302 Report of Investigation on 10/27/89. Although this statement suggested that the government had information concerning a possible location of an imminent meeting which was not included in its written submission, the judge did not request any elaboration. Rather, he gave Kottmyer his home telephone number, said he would be unavailable on Saturday afternoon, and stated that if he could not be reached before any entry, he should, as also provided by the proposed Order, be notified as soon thereafter as possible. Kottmyer Supp.Aff. ¶ 8. Kottmyer also told the judge that the targets might be indicted before the 30 day period of the requested warrant expired, but if that occurred intercepts would immediately terminate. *Id.*

At the time Kottmyer met with Judge Nelson, she did not believe that 34 Guild Street would actually be used for a Mafia induction ceremony. Kottmyer Second Supp.Aff. ¶ 4; Tr. at 103, 134–36. Rather, she felt that her adversaries generally, and Russo particularly, had been very "savvy" in their efforts to evade electronic surveillance. Tr. at 136. She simply could not believe that they would tell Federico the location of an induction ceremony and that he would disclose the address on a furlough application. Kottmyer Second Supp. Aff. ¶ 4; Tr. at 103, 135–36.

Kottmyer had been busy on the afternoon of October 27, 1989. Tr. at 158. She worked on other matters; spoke with officials of the Department of Justice in Washington, D.C. about the status of the approval for her Application and about the possible indictment of some of the present defendants; and spoke with Ring and Steffens about 34 Guild Street and other possible places roving intercept authority might be employed. Kottmyer Second Supp.Aff. ¶ 4; Tr. at 159.

Kottmyer did not consciously consider whether she was required by § 2518(11)(a)(ii) to advise Judge Nelson of the information she had recently received regarding 34 Guild Street. Tr. at 160–61. She understood that provision to require only that an application make a showing that the proposed targets were intentionally attempting to thwart electronic surveillance—which is the standard to be met to obtain a roving wiretap warrant under § 2518(11)(b)(ii). Tr. at 131. In Kottmyer's view, mentioning 34 Guild Street would have strengthened the evidence of an effort to frustrate electronic surveillance because it was a residence at which none of the individuals under investigation lived and which would apparently be used only once to avoid detection. Tr. at 135–36, 161–62.

Nor did Kottmyer fail to mention 34 Guild Street to Judge Nelson in order to protect the identity of any informant; to avoid any snags in obtaining the warrant; or to obtain any perceived tactical advantage. Tr. at 163–64.

Rather, Kottmyer considered the information concerning 34 Guild Street only in connection with her obligation under the proposed Order to advise the judge in advance, if possible, of any decision to make an entry. Tr. at 95, 108–112, 136. When she met with Judge Nelson, no decision to install a microphone at 34 Guild Street had been made and Kottmyer felt it would be

premature, at best, to seek authorization to enter the residence there. Kottmyer Second Supp.Aff. ¶ 5; Tr. at 46–47, 82–85. She would, however, have identified that location if she had been asked after advising the judge that an entry might be attempted that weekend. Kottmyer Second Supp.Aff. ¶ 5; Tr. at 137.

■ It was an error for the government not to revise its Application and Steffens' Affidavit to include the information it had obtained concerning 34 Guild Street. As explained in sections III.3 and IV.2, *infra*, with regard to "probable cause," the government is only required to furnish the court with "a full and complete statement of the facts and circumstances *relied upon* by the applicant." § 2518(1)(b) (emphasis added). Thus, the government has some discretion not to rely upon—and therefore not disclose—all of the information available to it in seeking to establish probable cause. However, the obligation to make "a full and complete statement" as to why the government believes it is "impractical" to specify the place where oral conversations to be intercepted will probably occur is unqualified. The statute requires that the government tell the court everything on this issue so an independent, fully informed decision can be made as to whether it is necessary and appropriate to issue a roving intercept warrant. § 2518(11)(a)(ii).

Nevertheless, after careful consideration of all of the evidence, including an assessment of Kottmyer's credibility, the court finds her conduct to have been in complete good faith. She did not deliberately withhold from Judge Nelson information she believed was legally required to be disclosed. In view of the fast pace at which matters were proceeding, the government's sincere and well-founded skepticism about whether 34 Guild Street would actually be used for criminal activity, and the lack of clarity concerning whether the "full and complete statement" concerning "practicality" called for by § 2518(11)(a)(ii) to obtain a roving warrant to intercept oral communications required more than the showing of a purpose to "thwart interception by changing facilities" called for by § 2518(11)(b)(ii) to obtain authorization to intercept telephone conversations, Kottmyer's conduct also did not constitute reckless disregard of her legal obligations. Kottmyer Second Supp.Aff. ¶ 6; Tr. at 52–53, 131; *see* section IV.2 *infra*, amplifying these facts and this analysis.

In addition, the omission of the information concerning 34 Guild Street and the related misstatements in Steffens' Affidavit were not material. Rather, the court finds that if Judge Nelson—or any reasonable judge—had been fully informed concerning the possible imminent Mafia induction ceremony and its location, he or she nevertheless would have authorized electronic surveillance of 34 Guild Street, either by signing the proposed order authorizing the roving interception in its original form or by amending it to add express authorization for 34 Guild Street as well as other, unspecified locations. More specifically, the court finds that any reasonable judge presented on a Friday evening with an Application providing probable cause to believe a Mafia induction ceremony could be intercepted that weekend would not reject a request for a roving warrant and run the risk that the opportunity would be lost while the government attempted to revise and resubmit its papers.

In any event, at 6:25 p.m. on October 27, 1989, Judge Nelson endorsed the proposed Order submitted by the government. *See* Appendix 1. In the Order, the court found, among other things: that there was probable cause to believe Russo, Ferrara and Carrozza had committed, and were continuing to commit, crimes including murder in the conduct of a RICO enterprise, Order ¶¶ 2–4; that normal investigative techniques had either been tried without success or reasonably appeared unlikely to succeed if tried or to be too dangerous, *id.* ¶ 7; that there was probable cause to believe evidence of the specified crimes would be obtained through electronic surveillance of oral communications involving Russo, Ferrara, or Carrozza, *id.* ¶ 5; and that it was not practical to specify *each* of the locations at which such communications would be intercepted, *id.* ¶ 6 (emphasis added).

Thus the Order authorized the government to "intercept oral communications made by, directed to, and/or in the presence of Joseph A. Russo, Vincent M. Ferrara, and/or Robert F. Carrozza concerning [the earlier identified] offenses, at such various and changing locations." *Id.* p. 5. The Order also authorized the government to enter buildings surreptitiously to install listening devices, and required that the court be notified of such entries and their location in advance if possible, or as soon thereafter as possible if advance notice were not feasible. *Id.* p. 6. In addition, the Order provided that no interception could occur unless visual or other surveillance indicated that Russo, Ferrara and/or Carrozza was present. *Id.* The authorization, by its terms, terminated after no more than 30 days. *Id.* Reports to the court regarding progress toward achievement of the authorized objectives and the need for continued interception were required every seven days. *Id.* p. 7.

On the afternoon of Saturday October 28, 1989, Kottmyer and Ring spoke and decided to attempt to install listening devices at 34 Guild Street. Tr. at 85. At about 3:30 p.m., the FBI observed the DiStefanos leave their home at 34 Guild Street with their suitcases. Ring Aff. ¶ 3(q). At about 4:45 p.m., Kottmyer called Judge Nelson at his residence to inform him of the intended entry, but did not reach him. Kottmyer Aff. ¶ 3. Although she left her home telephone number, the Judge did not call back. *Id.*

Kottmyer called and spoke with Judge Nelson in his chambers at 9:00 a.m. on Sunday, October 29, 1989. *Id.* She informed him that, pursuant to his Order, a surreptitious entry had been made at 34 Guild Street the previous evening and that interception would likely begin later that day. *Id.;* Memorandum of Diane Kottmyer dated October 30, 1989.

At about 9:40 a.m. on October 29, 1989, the FBI observed Russo and Ferrara enter 34 Guild Street. Ring Aff. ¶ 3(u). Interceptions then began. *Id.* As a result, the government overheard and recorded a LCN induction ceremony. The intercepted conversations also included discussion of certain criminal activities of the Patriarca Family. For example, transcripts of the intercepted conversations indicate that in the presence of most of the defendants in this case, the new members swore their life-long, paramount loyalty to the LCN and acknowledged that only death would end their membership; promised not to divulge the existence or secrets of the LCN; and undertook to kill informants, including blood relatives, if instructed to do so. At about 4:30 p.m., Russo and Ferrara left 34 Guild Street and the electronic surveillance terminated. Ring Aff. ¶ 3(v).

During the next two weeks, the FBI unsuccessfully attempted to identify other locations for electronic surveillance pursuant to Judge Nelson's Order. *Id.* ¶ 3(w). This effort ended when Russo, Ferrara, and Carrozza were arrested on November 14, 1989. *Id.*

On November 16, 1989, Russo, Ferrara, Carrozza, Lepore, and Angelo Mercurio were charged in a 57 count, 124 page Indictment alleging, among other things, that they were members of a RICO enterprise known as the Patriarca Family of the LCN. On March 22, 1990, a 65 count, 152 page Superceding Indictment was returned by the grand jury. It named Patriarca, Tortora, and Barone as additional defendants. The Superceding Indictment disclosed for the first time that the October 29, 1989 Mafia induction ceremony at 34 Guild Street had been intercepted and recorded by the government.

III. *The Roving Intercept Provisions Of Title III Are Constitutional As Applied To This Case*

1. The statute must be analyzed as applied to this case.

▮ All of the defendants except Lepore were present and had their communications intercepted at 34 Guild Street on October 29, 1989. Each of those intercepted is an "aggrieved person" with standing to litigate this motion to suppress. *See* §§ 2510(11) and 2518(10)(a).

██ The defendants contend that the roving intercept provision of Title III should be found unconstitutional on its face. More specifically, defendants contend that a roving intercept order issued pursuant to § 2518(11) may authorize the installation of listening devices at an unlimited number of locations, without any judicial finding that there is probable cause to believe that criminal conversation is about to occur at each location, and therefore would allow executing officers a degree of discretion which violates the Fourth Amendment.

This court concludes, however, that the constitutionality of the roving intercept provision of Title III must be evaluated as it was implemented by the Order in this case. When so assessed, the roving intercept provision is consistent with the requirements of the Fourth Amendment.

In support of their claim that the provisions at issue should be evaluated facially, defendants mention *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), in which a New York wiretap statute was invalidated on its face. In *Berger*, however, four members of the Supreme Court objected to deciding the issue on the face of the statute, rather than as applied. 388 U.S. at 68, 87 S.Ct. at 1888 (Stewart, J., concurring in the result) ("The issue before us, as Mr. Justice White says, is 'whether *this* search complied with Fourth Amendment standards.' "); *id.* at 70–71, 87 S.Ct. at 1889–90 (Black, J., dissenting); *id.* at 90, 87 S.Ct. at 1899 (Harlan, J., dissenting) ("The court declares without further explanation that since petitioner was 'affected' by [the statute], he may challenge its validity on its face. Nothing in the cases of this Court supports this wholly ambiguous standard ..."); *id.* at 107, 87 S.Ct. at 1908–09 (White, J., dissenting) ("I dissent from the majority's decision which unjustifiably strikes down [the statute] 'on its face' ...").

Since the decision in *Berger*, the Supreme Court has clarified that, with some limited exceptions, when the constitutionality of a statute is challenged, the question to be decided is whether the statute is unconstitutional as applied in the particular case. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973). As the Court has stated:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.... [This rule] reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. *See Younger v. Harris*, 401 U.S. 37, 52 [91 S.Ct. 746, 754, 27 L.Ed.2d 669] (1971). Constitutional judgments, as Mr. Chief Justice Marshall recognized [in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803)] are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the court.

*Id.* at 610–11, 93 S.Ct. at 2915.

Consistent with this rule, the Supreme Court refused to invalidate on its face the pretrial detention provisions of the Bail Reform Act of 1984. *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). As the Court stated in addressing this issue:

> The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

*Id.* at 745, 107 S.Ct. at 2100. *See also Schall v. Martin*, 467 U.S. 253, 268 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984) ("More fundamentally, this sort of attack on a criminal [bail] statute must be made on a case-by-case basis.... [O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad.").

Indeed, the Supreme Court has indicated that even when statutes have been invali-

dated in part because of their chilling effect on First Amendment rights:

> [T]he statutes [at issue] were unconstitutional as applied to the defendants' conduct, but they were also unconstitutional on their face because it was apparent that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas. In cases of this character a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner. *Such holdings invalidated entire statutes, but did not create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court.*

*City Council v. Taxpayers for Vincent,* 466 U.S. 789, 797–98, 104 S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984) (footnotes omitted) (emphasis added).

The defendants claim that their First Amendment rights are implicated in this case because the roving intercept was directed at capturing a Mafia induction ceremony, which they say involved defendants' freedom of assembly, association and speech. *See, e.g., United States v. Apker,* 705 F.2d 293, 301 (8th Cir.1983) (First Amendment rights are implicated, but do not invalidate search relating to "Hells Angels"), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. Rubio,* 727 F.2d 786, 792 (9th Cir.1984) (same). It is, however, doubtful that the Patriarca family enjoys such protection.

As of October, 1989, the Patriarca family of the LCN had been proven to be a RICO enterprise in earlier cases. *See Angiulo,* 897 F.2d at 1176; *Zannino,* 895 F.2d at 3; *Angiulo,* 847 F.2d at 960. As the Court of Appeals said in *Apker,* "(n)ot all associations of individuals implicate the right of association. For instance, [there are no] cases finding criminal conspiracies themselves within the realm of the freedom of association." 705 F.2d at 301 n. 8. Similarly, it is doubtful that RICO enterprises are within the realm of freedom of associa-

tion. Thus, it is questionable whether First Amendment rights are implicated in this case.

Even assuming, however, that there is associational activity protected by the First Amendment at issue here, this court concludes that it is not appropriate to evaluate the constitutionality of 18 U.S.C. § 2518(11) solely on its face, or exclusively on the basis of its potential effect in hypothetical cases. Rather, as the Court of Appeals for the First Circuit has said in the context of a conspiracy case:

> The fact that a seemingly normal criminal statute, by virtue of its prohibition of conspiracy and crime counseling, may in some instances apply to affect freedom of association or freedom of speech does not invalidate the statute. *See United States v. O'Brien,* 391 U.S. 367 [88 S.Ct. 1673, 20 L.Ed.2d 672] (1968). The court's obligation is, rather, to make sure that such a statute does not improperly infringe upon speech in any particular instance.

*United States v. Spock,* 416 F.2d 165, 173 n. 20 (1st Cir.1969); *see also United States v. Rowlee,* 899 F.2d 1275, 1278 (2d Cir.) (First Amendment does not provide a defense to conspiracy charge where speech " 'is an integral part of conduct in violation of a valid criminal statute.' ") (quoting *New York v. Ferber,* 458 U.S. 747, 761–62, 102 S.Ct. 3348, 3357, 73 L.Ed.2d 1113 (1982)), *cert. denied,* —— U.S. ——, 111 S.Ct. 87, 112 L.Ed.2d 59 (1990).

Accordingly, it is necessary to evaluate the constitutionality of the roving intercept provisions of Title III as they apply to the circumstances of this case. More specifically, while the court recognizes that a limited execution of an overly broad warrant may not validate a search, it is necessary to evaluate the constitutionality of § 2518(11)(a) in the context of the Order implementing it in this case. For the reasons explained in the remainder of this section, such analysis indicates that the roving intercept provisions are constitutional as applied in this case.

2. The purposes of the Fourth Amendment and its evolving application to electronic surveillance.

The question whether § 2518(11) violates the Fourth Amendment requires consideration of the origins of the Amendment and its evolution, particularly as it has been construed concerning electronic surveillance. As set forth below, viewed in this context, the roving intercept provision of Title III is constitutional as applied in this case.

The origin of the Fourth Amendment lies largely in the primary causes of the American Revolution. The Amendment was a response to the general warrants and writs of assistance which were "a motivating factor behind the Declaration of Independence." *Berger*, 388 U.S. at 58, 87 S.Ct. at 1883.[4]

> The general warrant specified only an offense—typically seditious libel—and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. Similarly, the writs of assistance used in the Colonies noted only the object of the search—any uncustomed goods—and thus left customs officials completely free to search any place where they believed such goods might be.

*Steagald v. United States*, 451 U.S. 204, 221, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981).

As the Supreme Court in *Steagald* recognized, the searches and seizures which spawned the Fourth Amendment were often aimed at political dissidents. *Id.; see also Stanford v. Texas*, 379 U.S. 476, 85

S.Ct. 506, 13 L.Ed.2d 431 (1965); *Entick v. Carrington*, 19 How.St.Tr. 1029 (1765). Such searches were especially offensive because they typically involved "the ransacking by Crown officers of the homes of citizens in search of evidence of crime or illegally imported goods." *Frank v. Maryland*, 359 U.S. 360, 363, 79 S.Ct. 804, 807, 3 L.Ed.2d 877 (1959). The Fourth Amendment was a direct response to these abuses. *Id.*

As Attorney General Edward H. Levi testified in 1975:

> The words of the Fourth Amendment are mostly the products of James Madison. His original version appeared to be directed solely at the issuance of improper warrants.[5] Revisions accomplished under circumstances that are still unclear transformed the Amendment into two separate clauses. The change has influenced our understanding of the nature of the rights it affects.

The National Security Agency and the Fourth Amendment: Hearings on S.Res. 21 Vol. 5 Before the Senate Select Committee to Study Government Operations With Respect to Intelligence Activities, 94th Cong., 1st Sess. (1975) (testimony of Edward H. Levi, Attorney General of the United States).

As enacted, the Fourth Amendment states: "[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be

---

**4.** The importance of the general warrants and writs of assistance in sparking the American Revolution was evident to John Adams, who observed the argument of James Otis, Jr. concerning the writs before the Supreme Court of Judicature in 1761. As Adams reported it:

> American independence was then and there born; ... Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against the writs of assistance. Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.

2 *Legal Papers of John Adams* 107 (K. Wroth & H. Zobel) (1965).

**5.** Madison's proposal read as follows:

> The rights of the people to be secure in their persons, their houses, their papers, and their other property, from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized.

Levi, *supra, citing* Annals of Cong., 1st Cong., 1st Sess. p. 452.

searched, and persons and things to be seized." U.S. Const. amend. IV.

The structure of the Fourth Amendment suggests an overriding interest in assuring that searches and seizures are reasonable. This structure recognizes the possibility that exigent circumstances, among other things, might render obtaining a warrant impractical. *See, e.g., Shmerber v. California*, 384 U.S. 757, 761–77, 86 S.Ct. 1826, 1830–39, 16 L.Ed.2d 908 (1966) (blood test for drunkenness); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to arrest); *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (automobiles).

Usually, however, a warrant issued by an independent judicial officer, based upon a showing of probable cause, was considered to be an essential element of a reasonable search. As the Court stated in *Steagald:*

> [T]he placement of this checkpoint between the Government and the citizen implicitly acknowledges that an "officer engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States*, 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436] (1948), may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home.

451 U.S. at 212, 101 S.Ct. at 1648.

In addition, the Fourth Amendment requires that the place to be searched and the items to be seized be described "particularly." The primary purpose of these provisions is to limit the discretion, and promote the accountability, of the officers executing a warrant. A particular description of the thing to be seized precludes general searches and prevents the seizure of one thing under a warrant describing another. *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).[6]

The requirement that the place to be searched be described particularly serves as a similar purpose, and has been interpreted to mean only that the description be "such that the officer with a search warrant can with reasonable effort ascertain, and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925).

Our understanding of the purposes and effects of the Fourth Amendment has been an evolving one. From the outset, the Amendment has been understood to protect the people from the unlimited authority of law enforcement officials to search almost anywhere and seize almost anything which characterized the despised general warrants and writs of assistance.

Over time, however, the Amendment has been construed to serve other purposes. One such purpose is to accord to each individual a measure of autonomy and privacy, which are vital to human dignity. As Justice Louis Brandeis stated it in his dissent in *Olmstead v. United States*, in the Fourth Amendment the Founders "conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Thus, while the Fourth Amendment does not establish an unqualified right to privacy, promoting individual autonomy is a value close to its core. Levi, *supra.*

As a corollary of this, the Fourth Amendment reflects a special concern with intrusions when the purpose is to obtain evidence to incriminate the victim of a search. *Id.* This concern for self-incrimination is reflected in the Supreme Court's test which limits standing to invoke the exclusionary rule to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. *United*

---

6. In *Marron,* the Supreme Court also stated that, "(a)s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 U.S. at 196, 48 S.Ct. at 76. The evolution of Fourth Amendment jurisprudence, however, indicates that this statement is now too expansive. Some discretion in executing a warrant is today recognized as permissible. For example, officers may seize evidence not specified in a warrant if it is discovered in plain view in the course of a legitimate search. *Horton v. California*, — U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

*States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

The Fourth Amendment also reflects a particular concern for protecting freedom of thought, speech, and religion. As Justice Lewis Powell wrote, "Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs." *United States v. United States District Court,* 407 U.S. 297, 314, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972).

The interpretation of the Fourth Amendment as applied to electronic surveillance has been especially characterized by evolution. In *Olmstead,* Chief Justice William Howard Taft, writing for the majority, found that wiretapping a telephone conversation to develop evidence to be used in a criminal trial did not constitute a "search" or "seizure" in the absence of a physical trespass. *Olmstead,* 277 U.S. at 464, 48 S.Ct. at 567–68. The Amendment expressly protects the right of the people to be secure in their "persons, houses, papers and effects." These words indicate a concern for tangible items. Thus, Chief Justice Taft found that for the Fourth Amendment's prohibition to apply, the search at issue must be for "material things." *Id.* Accordingly, in the absence of a physical entry to a house or office, the interception of telephone communications was found in *Olmstead* not to involve a "search" or "seizure" within the meaning of the Fourth Amendment. *Id.*

In his dissent, Justice Brandeis decried the Chief Justice's analysis, stating that, "(t)ime and again, this Court in giving effect to the principle underlying the Fourth Amendment, has refused to place an unduly literal construction upon it." *Id.* at 476, 48 S.Ct. at 571 (Brandeis, J., dissenting). Echoing this view, Justice Oliver Wendell Holmes, Jr. wrote, "I fully agree that Courts are apt to err by sticking too closely to the words of a law where those words import a policy that goes beyond them." *Id.* at 469, 48 S.Ct. at 569 (Holmes, J., dissenting).

After *Olmstead,* the interpretation of the Fourth Amendment in cases concerning the interception of wire and oral communications steadily departed from application of its literal language and increasingly adopted a functional approach aimed at protecting privacy from unreasonable searches. *See Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942) (indicating that private conversation could be a protected "effect" within the meaning of the Fourth Amendment); *Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (abandoning theory of trespass and relying on concept of a "constitutionally protected area" to suppress overheard evidence); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (expressly holding Fourth Amendment protects against overhearing of verbal statements). This trend led to the recognition in *Berger* that *Olmstead* had effectively been overruled. *Berger,* 388 U.S. at 41, 87 S.Ct. at 1873.

In *Berger,* the Supreme Court invalidated the New York wiretapping statute because of a combination of defects which cumulatively violated the Fourth Amendment. *Id.* The Court found that the statute at issue satisfied the requirement that a warrant be issued by an independent judicial officer. *Id.* at 54, 87 S.Ct. at 1881. The statute was deemed constitutionally infirm, however, because it: did not require a showing of probable cause to believe a particular offense had been or was being committed, *id.* at 58–59, 87 S.Ct. at 1883; did not require a particular description of the conversations to be intercepted, other than to identify the targeted individual, *id.* at 59, 87 S.Ct. at 1883; was for a two-month period, and permitted extensions without any further showing of probable cause, *id.* at 59, 87 S.Ct. at 1883; and did not provide for the return of the warrant to a judicial officer. *Id.* at 60, 87 S.Ct. at 1884. Thus, the Court found that the statute failed to meet the Fourth Amendment's probable cause requirement and unconstitutionally left too much discretion to the executing officers. *Id.* at 59–60, 87 S.Ct. at 1883–84.

In *Berger*, the Supreme Court contrasted the New York statute with the procedure it had recently affirmed in *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). *Berger*, 388 U.S. at 57, 87 S.Ct. at 1882. In *Osborn*, a judicial warrant, based on a showing of probable cause to believe a crime was being committed, was issued for the surreptitious tape recording of a conversation with the consent of one of the participants. 385 U.S. at 326–330, 87 S.Ct. at 431–33. As described in *Berger*, the warrant in *Osborn* "afforded *similar* protections to those that are present in the use of conventional warrants authorizing the seizure of tangible evidence." 388 U.S. at 57, 87 S.Ct. at 1882 (emphasis added).

The Court reiterated this observation concerning *Osborn* in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Katz*, the Court emphasized that, "(a)lthough the protections afforded the petitioner in *Osborn* were 'similar ... to those ... of conventional warrants,' they were not identical" because they did not provide for advance notice to the suspect of the intended search. 389 U.S. at 355 n. 16, 88 S.Ct. at 513 n. 16. In both *Berger* and *Katz*, the Supreme Court stated that the protections provided by the somewhat unconventional warrant in *Osborn* were constitutionally sufficient because they permitted "no greater invasion of privacy ... than was necessary under the circumstances." *Berger*, 388 U.S. at 57, 87 S.Ct. at 1883; *Katz*, 389 U.S. at 355, 88 S.Ct. at 513.

*Katz* clearly established, however, that a warrant was required for a wiretap, even in the absence of a trespass because, as the Court then held, "the Fourth Amendment protects people not places." 389 U.S. at 351, 88 S.Ct. at 511. The Court invalidated the warrantless wiretap at issue in *Katz* because the government had not obtained a warrant in circumstances where a judicial order similar to that issued in *Osborn* "could have accommodated 'the legitimate needs of law enforcement' by authorizing the carefully limited use of electronic surveillance." *Id.* at 355–56, 88 S.Ct. at 514

(quoting *Lopez v. United States*, 373 U.S. 427, 464, 83 S.Ct. 1381, 1401, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting)).

Accordingly, by 1968, *Olmstead* had been clearly overruled; the Supreme Court had established that the Fourth Amendment applied to the interception of wire and oral communications; and it was clear that judicial warrants would generally be required for such interceptions. Significantly for this case, however, the Supreme Court also then recognized that such orders might properly differ from conventional warrants aimed at searches and seizures for tangible items in order to accommodate "the legitimate needs of law enforcement." *Id.*

3. The enactment and evolution of Title III.

In 1968, Title III was enacted as a direct response to the recent decisions in *Berger* and *Katz*. Congress sought to enact a statute which would properly protect the privacy of oral and wire communications, while delineating a uniform basis to obtain authorization of their interception in appropriate cases. S.Rep. No. 1097, 90th Cong., 2d Sess. 2, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2157 (hereinafter "1968 Leg.Hist. at ——").

"The major purpose of Title III [was] to combat organized crime." 1968 Leg.Hist. at 2157. Congress and the President moved quickly to enact Title III because it was recognized that "intercepting the communications of organized criminals is the only effective method of learning of their activities." *Id.* at 2159; *see also* 1968 Leg. Hist. at 2177.

Title III as originally enacted contained provisions intended to meet the requirements of the Fourth Amendment as expressed in *Berger* and *Katz*, and also contained many additional provisions to regulate the interception of communications which were not constitutionally compelled. As explained in Section IV.1, *infra*, this distinction has come to make a difference with regard to motions to suppress. The judicially crafted and evolving exclusionary rule concerning violations of the Fourth

Amendment is applicable to violations of the provisions of Title III which reflect constitutional commands, while the static statutory exclusionary provisions of Title III govern violations of sections of the statute which are solely legislated requirements.

Title III recognizes that there may be emergency situations involving organized crime in which it would not be possible to obtain a warrant to intercept communications. *See* 18 U.S.C. § 2518(7) (1988). In such limited circumstances, brief warrantless surveillance, subject to later judicial approval, is authorized. *Id.* Absent such an exigency, however, the statute requires a judge to issue an order authorizing the interception of any oral or wire communication.

To obtain a warrant to intercept communications the government must make a "full and complete statement of the facts and circumstances relied upon" to satisfy several constitutional criteria. § 2518(1)(b), (c), (d). These include a "full and complete statement as to whether or not other investigative procedures have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). This showing of necessity reflects the Fourth Amendment requirement that searches and seizures be "reasonable" and addresses the related statements in *Berger*, 388 U.S. at 57, 87 S.Ct. at 1882, and *Katz*, 389 U.S. at 355–56, 88 S.Ct. at 513–14, that courts should authorize "no greater invasion of privacy ... than [is] necessary under the circumstances." *See also* Goldsmith, *The Supreme Court and Title III: Rewriting the Law of Electronic Surveillance*, 74 J.Crim.L. & Criminology 1, 126 (1983).

■ Title III also requires that the government furnish the court with the information it relies upon in representing that probable cause exists to believe that a particular offense has been or will be committed; particularly describing the place where oral communications will be intercepted; particularly describing the type of communications sought to be intercepted;

and identification of the person, *if known*, committing the offense and whose communications are to be intercepted. § 2518(1)(b)(i), (ii), (iii) (emphasis added). Congress thought all these provisions were necessary to address the particularity requirements of the Fourth Amendment. 1968 Leg.Hist. at 2190. The Supreme Court subsequently clarified, however, that "(i)t is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named." *United States v. Donovan*, 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 668 n. 15, 50 L.Ed.2d 652 (1977).

The statute provides that the judge may require that the government furnish additional information in support of its application. § 2518(2). It also provides that the judge may enter an order authorizing an interception "as requested or as modified" by the judge. § 2518(3). Any such order, however, is required to include findings by the issuing judge that, among other things, the statutory provisions of Title III which implement the probable cause and necessity requirements of the Fourth Amendment are satisfied. § 2518(3)(a), (b), (c). In addition, except with regard to roving intercepts and wiretaps, the court must find there is probable cause to believe that criminal conversations will be intercepted at a specified location. § 2518(3)(d).

As indicated earlier, Title III also includes many provisions which do not reflect commands of the Fourth Amendment. For example, these include the statutory requirements that the government's application be authorized by a senior official of the Department of Justice, that all prior applications for electronic surveillance of certain individuals be identified, that all intercepted conversations be recorded, and that such tapes be sealed. §§ 2516(1), 2518(1)(c), 2518(8).

■ In 1986, Congress amended Title III to, among other things, add the roving intercept provisions at issue in this case. § 2518(11). Section 2518(11) reflects a recognition that criminals, particularly including members of organized crime, have become aware of the government's ability to

intercept their communications and often endeavor to frustrate such law enforcement efforts.

Subsection 11(a), which relates to the interception of oral communications, relaxes the usual Title III requirements that the government provide the court in advance with "a particular description of ... the place where the communication is to be intercepted," § 2518(1)(b)(ii), and the requirement that the court find that there is probable cause to believe that place is "being used, or [is] about to be used, in connection with" an offense for which electronic surveillance is authorized by Title III, § 2518(3)(d). To obtain such an order, the government must furnish the court with:

[A] full and complete statement of why such specification is *not practical* and identif[ying] the person committing the offense and whose communications are to be intercepted.

§ 2518(11)(a)(ii) (emphasis added). The court must then find the usual specification of the place to be searched "is not practical." § 2518(11)(a)(iii).

The parallel provision concerning roving wiretaps for the interception of telephone communications requires the government to identify the person committing the offense and "a showing of a purpose, on the part of that person, to thwart interception by changing facilities." § 2518(11)(b)(ii). Once again, the court must independently determine that the required showing has been made. § 2518(11)(b)(iii).

Thus, while the roving intercept and roving wiretap provisions were apparently similarly motivated, they include somewhat different, and potentially confusing, standards. More specifically, the roving intercept provision requires a "full and complete statement;" the roving wiretap provision does not. Similarly, the roving intercept provision requires a showing that it is impractical to satisfy the usual specification requirements of Title III; the roving wiretap provision requires a demonstration that the individual to be targeted is attempting to evade interception.

The legislative history does not indicate whether these distinctions were intended to have substantive effects. With regard to the roving interception provisions, Congress cited an effort to thwart surveillance as the example of impracticality, stating:

The judge must find that the ordinary specification rules are not practical. Situations where ordinary specification rules would not be practical would include those where a suspect moves from room to room in a hotel to avoid a bug or where a suspect sets up a meeting with another suspect on a beach or a field. In such situations, the order would indicate authority to follow the suspect and engage in the interception once the targeted conversation occurs.

S.Rep. No. 541, 99th Cong. 2d Sess. 32, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3586 (hereinafter "1986 Leg.Hist. at ____").

The corresponding legislative history concerning the roving wiretap provision, which immediately follows the above-quoted language, simply states that "the rule with respect to 'wire communications' is somewhat similar." *Id.* It then goes on to cite examples of a terrorist who moves from phone booth to phone booth to avoid detection, or a person who is overheard saying he or she will use different telephones to evade surveillance. *Id.*

Thus, it appears that the roving intercept provision contemplates that a roving authorization will often be obtained in cases where specifying a location in advance is not practical because the target is attempting to thwart surveillance, but is not limited to such circumstances.

In any event, the roving intercept provision does not relax the usual Title III provisions which relate to the Fourth Amendment requirement that the conversation to be intercepted—which is the thing to be seized—be described with particularity. Indeed, in contrast to the usual case where the anticipated speaker must be identified only "if known," § 2518(1)(b)(iv), the person targeted for roving interception must be identified and only specified criminal

conversation involving that individual may be intercepted. §§ 2518(4)(c), 2518(11)(a)(ii).

In addition, the roving intercept provisions address the Fourth Amendment's requirement that the place to be searched be particularly described by identifying that location in terms of where a specified individual engages in certain conversation. Interceptions pursuant to a roving intercept order "shall not begin until ... the place where the communication is to be intercepted is ascertained." § 2518(12). In this case, this statutory provision was implemented in the Order which required that no interception occur unless visual or other surveillance indicated that one of the targeted individuals was present. It is this aspect of the Warrant which defendants most strenuously assert is constitutionally inadequate.

As set forth below, however, the court concludes that the search and seizures authorized by the Order implementing the roving intercept provisions in this case were reasonable and satisfied the particularity requirements of the Fourth Amendment, including the requirement that the place to be searched be particularly described.

4. The evolution of the Fourth Amendment since Berger and Katz.

Since the Supreme Court decided *Berger* and *Katz* in 1967, its interpretation of the Fourth Amendment has continued to evolve in ways which must be recognized in resolving defendants' claim that the roving intercept provision of Title III is unconstitutional. Among other things, the Court has observed that, "crime has changed, as have the means of law enforcement..... [thus the Fourth] Amendment's prohibition against 'unreasonable searches and seizures' must be interpreted 'in light of contemporary norms and conditions.'" *Steagald v. United States*, 451 U.S. 204, 217 n. 10, 101 S.Ct. 1642, 1650 n. 10, 68 L.Ed.2d 38 (1981) (quoting *Payton v. New York*, 445 U.S. 573, 591, n. 33, 100 S.Ct. 1371, 1382, n. 33, 63 L.Ed.2d 639 (1980)). Accordingly, Justice William Brennan's observation that "the requirements of the Fourth Amend-

ment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement" remains valid. *Lopez v. United States*, 373 U.S. 427, 464, 83 S.Ct. 1381, 1401, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting); *see also Berger*, 388 U.S. at 63, 87 S.Ct. at 1885.

In addition, the Supreme Court has, at least since the era in which *Berger* and *Katz* were decided, affirmed the relaxation of traditional Fourth Amendment requirements where it was impractical to implement them and the intrusions at issue were deemed necessary and reasonable. In 1968, Chief Justice Earl Warren wrote the opinion finding that police can conduct a limited stop and frisk upon less than probable cause because "as a practical matter" a stop and frisk could not be subject to a warrant and probable cause requirement and still allow law enforcement officers to take the measures required to assure that those stopped for questioning are not armed and dangerous to them. *Terry v. Ohio*, 392 U.S. 1, 20–21, 23–24, 88 S.Ct. 1868, 1879–80, 1881–82, 20 L.Ed.2d 889 (1968). Similarly, the Court's holding that a roving Border Patrol may stop a car and briefly question its occupants upon less than probable cause was based in part upon "the absence of practical alternatives for policing the border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

More recently, the Supreme Court has increasingly emphasized that "the fundamental command of the Fourth Amendment is that searches and seizures be reasonable." *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). As a result, the Court has approved searches and seizures in a school, leading to a criminal prosecution, without requiring a warrant or the existence of probable cause to justify the intrusion. *Id.* Similarly, the Court has approved alcohol and drug testing for railway workers following accidents, for which criminal prosecutions are possible, without requiring a warrant or even reasonable suspicion that a particular employee may have been impaired. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402,

103 L.Ed.2d 639 (1989). The decisions in both *Skinner* and *T.L.O.* rested on the Court's perception that requiring warrants and probable cause for a search were impractical. *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414; *T.L.O.*, 469 U.S. at 351, 105 S.Ct. at 747 (Blackmun, J., concurring).

As a corollary of this increasing willingness to dispense with the warrant and probable cause requirements of the Fourth Amendment, the Court has required the utilization of judicial warrants, but encouraged flexibility concerning their content when conventional terms could not feasibly be employed. Thus, while requiring a warrant for administrative housing code searches, which could lead to criminal prosecutions, the Court indicated that it was not necessary to have probable cause to believe a particular building contained a code violation to obtain an order authorizing entry. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1987). Rather, the Court indicated, an appraisal of conditions in an area as a whole would suffice. *Id.* at 536, 87 S.Ct. at 1734. In these circumstances, the court emphasized that "reasonableness is still the ultimate standard," *id.* at 539, 87 S.Ct. at 1736, and explained that "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails," *id.* at 536–37, 87 S.Ct. at 1735.

Similarly, the Supreme Court has indicated that a warrant is needed to search vehicles some distance from our borders for illegal entrants, but suggested that a special form of order would be appropriate. *Almeida–Sanchez v. United States*, 413 U.S. 266, 284–85, 93 S.Ct. 2535, 2545, 37 L.Ed.2d 596 (Powell, J., concurring). As Justice Powell put it, " 'different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government ... and the protected rights of our citizens.' " *Id.* (quoting, *United States District Court*, 407 U.S. at 322–23, 92 S.Ct. at 2139).

Most significantly for this case, the Supreme Court has indicated that it would be appropriate to relax the specificity of the description of the place to be searched in a warrant if this were necessary to the viability of requiring a judicial order for a search and seizure. *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). In *Karo*, the government placed a beeper in a container of ether, an ingredient used in making illicit drugs. It then monitored the beeper as the container was transported to and kept in a specific house. The information generated by the beeper was used to secure a search warrant for that residence, which resulted in a criminal prosecution. *Id.* at 714, 104 S.Ct. at 3302.

The Supreme Court in *Karo* found that the monitoring of the beeper at the house was the functional equivalent of an entry to determine whether the container was there, and thus constituted a warrantless search and seizure. *Id.* at 715, 104 S.Ct. at 3303. This was deemed to be unreasonable and, therefore, a violation of the Fourth Amendment. *Id.* The Court explained that "(r)equiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search." *Id.* at 717, 104 S.Ct. at 3304.

While invalidating the warrantless search and seizure in *Karo*, the Court recognized that it would not be possible to identify in a warrant the address at which the beeper would be monitored because this was the exact information the beeper was employed to discover. However, the Court stated in language particularly meaningful for the instant case:

We are also unpersuaded by the argument that a warrant should not be required because of the difficulty in satisfying the particularity requirement of the Fourth Amendment. The Government contends that it would be impossible to describe the "place" to be searched, because the location of the place is precisely what is sought to be discovered through the search. *However true that may be, it will still be possible to describe the object into which the beeper is to be placed, the circum-*

*stances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance.*

*Id.* at 718, 104 S.Ct. at 3305 (emphasis added).

From the foregoing, the court concludes that the following principles are applicable to determining the constitutionality of the roving intercept provisions now at issue. Any search and seizure must be reasonable. Obtaining a warrant from a detached judicial officer is, absent truly exigent circumstances, an important element of reasonableness. Usually such a warrant must specify the address of a single location, or several particular locations, to be searched. If, however, this level of specificity is, for good reasons, not practical, it is reasonable to describe the place to be searched differently. Such a description may leave some discretion in the executing officers, if this is not likely to result in mistaken, unjustified intrusions and is necessary to both maintain the requirement of prior judicial approval and to accommodate legitimate, important needs of law enforcement.

As set forth below, the roving intercept provision, as implemented by the Order in this case, fully meets this test.

5. The roving intercept provision is constitutional as applied in the context of the Order in this case.

■ As set forth below, the roving intercept provision as applied by the Order in this case authorized a search and seizure which was reasonable, and which was made pursuant to a warrant that, among other things, satisfied the particularity clauses of the Fourth Amendment. Section 2518(11)(a) is, therefore, constitutional as applied here.

■ Although the defendants make expansive claims concerning the invasion of

their privacy in this case, they only have standing to complain concerning the capture of their conversation. They did not have any legitimate interest in the privacy of the DiStefano's residence at 34 Guild Street before they arrived there. Thus, they lack standing to assert that the entry to install listening devices injured their rights. *See United States v. Volpe,* 430 F.Supp. 931, 945 (D.Conn.1977), *aff'd,* 578 F.2d 1372 (2d Cir.1978), *cert. denied,* 441 U.S. 930, 99 S.Ct. 2049, 60 L.Ed.2d 658 (1979); *see also,* J. Carr, *The Law of Electronic Surveillance* § 6.2(b)(3) at 6–36.1 (1990).

More specifically, as the Supreme Court observed in *Karo:*

A "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed" *United States v. Jacobsen,* 466 U.S. 109, 113 [104 S.Ct. 1652, 1656, 80 L.Ed.2d 85] (1984) ... A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interest in that property." *Ibid.*

468 U.S. at 712, 104 S.Ct. at 3302. The defendants had no possessory interest or reasonable expectation of privacy concerning 34 Guild Street before they arrived there on October 29, 1989.[7]

The Fourth Amendment does, however, apply to the defendants' conversations while at 34 Guild Street because individuals legitimately expect that their conversations while in the homes of others will be private and society is prepared to recognize such expectations as reasonable. *See Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990); *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

The interception of an oral discussion is, of course, a "search and seizure." *Berger,* 388 U.S. at 51, 87 S.Ct. at 1879. The first and fundamental question then is whether that search and seizure was reasonable. *T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742. This "requires 'balancing the need to

---

**7.** The entry at 34 Guild Street was, in any event, authorized by the Warrant and permissible as necessary to implement the justified authoriza-

tion to intercept certain conversations. *See Dalia v. United States,* 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979).

search against the invasion which the search entails.'" *Id.* at 337, 105 S.Ct. at 740 (quoting *Camara*, 387 U.S. at 536–37, 87 S.Ct. at 1734–35).

In this case, the invasion was in one important sense most serious—its purpose and effect was to obtain evidence to be used against the subjects of the search in a criminal prosecution. In addition, if it is assumed that associational activity enjoying First Amendment protection was also implicated, the burden imposed by the intrusion is magnified.

Nevertheless, the search and seizure at issue—the interception of the Mafia induction ceremony—was reasonable. As Congress expressly recognized in enacting Title III, organized crime presents a serious threat to our society and the ability to intercept communications is indispensable to combating organized crime. In this case, Title III was utilized to serve its major purpose, investigating serious crimes—including a RICO conspiracy allegedly involving murder, drug trafficking, and obstruction of justice—by organized criminals. *See United States v. Kahn*, 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974).

This is not a case where there is any suggestion that the defendants were targeted because of their political or religious beliefs. Nor was the search aimed at obtaining their publications. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564, 98 S.Ct. 1970, 1980–81, 56 L.Ed.2d 525 (1978); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965).

In addition, the activity at issue here did not involve an invasion of any defendant's home or office.[8] In this case, the government did not intrude upon any defendant's most personal, private space. Indeed, the defendants evidently chose 34 Guild Street because they had no prior association with it and thus hoped to evade detection.

Therefore, in balancing the competing considerations to determine reasonableness, the value to be attributed to defendants' expectation of privacy is diminished. *See United States v. Torres*, 751 F.2d 875, 883 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).[9]

The fact that the roving interception was conducted pursuant to a warrant also militates in favor of its reasonableness. The judgment as to whether this extraordinary investigative technique was necessary and appropriate was made by an independent judge, rather than by "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). As described below, the warrant at issue is conventional in every respect except its description of the place to be searched. This exception would be justified if a judge properly found it was impractical to describe the place to be searched in the customary fashion, particularly if that conclusion was based upon a showing that the targeted individuals were structuring their communications to thwart surveillance.

■ Defendants correctly contend that in this case once the roving intercept order was issued, there was no express limitation on the number of places in which the government could install listening devices based upon executive, rather than judicial, branch decisions that there was a proper basis to do so. This theoretical potential for a large number of entries and installations, however, does not render the searches and seizures authorized by the Order in this case unreasonable.

First, while the statute does not impose a general requirement that a roving intercept order limit the number of intrusions permitted, there are practical constraints which operate to impose such limits. Elec-

---

8. The balancing concerning reasonableness might be different if the government's efforts concerning 34 Guild Street had generated evidence to be used against its residents, the DiStefanos. *See Steagald*, 451 U.S. at 211–16, 101 S.Ct. at 1647–50.

9. In *Torres*, the court stated: "A safe house is not a home. No one lives in these apartments, amidst the bombs and other paraphernalia of terrorism. They are places dedicated exclusively to illicit business.... There is no right to be let alone while assembling bombs in safe houses". 751 F.2d at 883.

tronic surveillance is difficult, labor intensive, and expensive. The government's capacity to utilize it is finite.

In addition, the Supreme Court has, in effect, put the government on notice that the discretion granted by a roving intercept order should be exercised with restraint because it has stated that searches and seizures pursuant to warrants will be invalidated if they are executed in an unreasonable manner. *Dalia*, 441 U.S. at 257, 99 S.Ct. at 1693 ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by a warrant—subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.' ") (footnote omitted).

In any event, the Order in this case contained provisions to minimize the risk that the roving authority it granted could be abused. The Order required that the court be notified in advance of any surreptitious entry, or as soon as possible thereafter if prior notice was not feasible. Order, p. 6. This procedure permitted the judge to revoke or revise the roving intercept Order if he perceived that the government was attempting too many intrusions, or seeking interceptions at sensitive locations such as religious institutions or political offices. *Dalia*, 441 U.S. at 258, 99 S.Ct. at 1693–94.

In addition, the Order required the government to file reports every seven days to show what had occurred and to seek to establish the need for the continuation of the roving authority. Order, p. 7. Thus, the Order provided regular opportunities for the court to review, and if appropriate revise or revoke, the Warrant. In addition, the Order by its terms expired after 30 days, unless extended pursuant to § 2518(5). *Id.* at 5.

As a practical matter, if an order similar to that issued in the instant case were not obtainable in advance of an interception, the government would be encouraged to engage in electronic surveillance of organized crime without a warrant when it learned of the location of an important meeting shortly before it was scheduled to

occur. *See* § 2518(7)(a)(iii). Such warrantless surveillance presents a greater risk to Fourth Amendment rights than the roving interception authorized here. *See Karo*, 468 U.S. at 718, 104 S.Ct. at 3305.

Thus, balancing the foregoing factors, the court concludes that the search and seizure authorized by the roving intercept provisions of Title III, as implemented by the court's Order, was reasonable. Thus, the Fourth Amendment's fundamental test has been satisfied.

In addition, that Order also satisfies the requirements of the warrant clause of the Fourth Amendment. In this case, the government obtained a warrant for the interception defendants now seek to suppress. That warrant was based upon a strong showing of probable cause to believe that the proposed targets of the electronic surveillance and their alleged co-conspirators were engaging in the type of serious crimes which must be involved to obtain a warrant pursuant to Title III. *See* §§ 2516(1)(c) and 2518(1)(b); Steffens Aff. pp. 11–56. The information presented to the judge also amply indicated that there was probable cause to believe that particular communications concerning those offenses would be obtained through the interceptions authorized. § 2518(3)(b).

In addition, § 2518(11)(a) does not in any way alter the usual Title III specification requirement concerning the "thing to be seized." Title III requires for both roving and regular electronic surveillance "details as to the particular offense that has been, is being, or is about to be committed [and] . . . a particular description of the type of communications sought to be intercepted." § 2518(1)(b). In this case the Order used a usual form of specifying such communications, providing for the interception of "oral communications made by, directed to, and/or in the presence of JOSEPH A. RUSSO, VINCENT M. FERRARA, and/or ROBERT F. CARROZZA," concerning the nature and extent of certain gambling businesses, the use of interstate facilities in such businesses, the use of murder, including the murder of William Grasso, in the conduct of a racketeering enterprise, and

the roles of the targets and others in that enterprise. Order, p. 3–5. As numerous courts have found, the pertinent provisions of Title III satisfy the Fourth Amendment requirement that the thing to be seized be particularly described. *See United States v. Gambale*, 610 F.Supp. 1515, 1537 (D.Mass.1985) *aff'd on other grounds sub nom. United States v. Angiulo*, 847 F.2d 956 (1st Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Dorfman*, 542 F.Supp. 345, 385 n. 41 (N.D.Ill.1982) (citing cases), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). This conclusion is equally apt in the context of the Order in this case.

■ Defendants most ardently assert, however, that the roving intercept provisions of Title III fail to satisfy the requirement that a warrant particularly describe the place to be searched. It should be noted, however, that the Fourth Amendment does not state that a warrant must contain an address, although this is usually included. Rather, as indicated earlier, the Supreme Court has found that, "it is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele*, 267 U.S. at 503, 45 S.Ct. at 417. "Obviously the primary purpose of this limitation is to minimize the risk that officers executing search warrants will by mistake search a place other than the place intended by the Magistrate." 2 W. LaFave, *Search and Seizure* § 4.5, at 207 (2d ed. 1987).

Like the other provisions of the Fourth Amendment, the requirement that the place or person to be searched be particularly described has been interpreted flexibly, depending on the circumstances. *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir.1978). In *Muckenthaler*, the government had probable cause to believe that several people arriving at an airport on a particular flight would be delivering cocaine to a man named Struble. The government could not, however, ascertain their names or describe their luggage.

*Id.* at 245–46. A search warrant was issued for "those persons or baggage 'being met' by Struble." *Id.*

The court analyzed the adequacy of this warrant, stating:

The constitutional standard for particularity of description in a search warrant is met if the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized. *Steele*, 267 U.S. at 503–04 [45 S.Ct. at 416]; *United States v. Davis*, 557 F.2d 1239, 1248 (8th Cir.), *cert. denied*, 434 U.S. 971 [98 S.Ct. 523, 54 L.Ed.2d 461] (1977); *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir. 1976). Accordingly, the degree of specificity is flexible depending upon the circumstances and the type of items involved. *United States v. Davis*, 542 F.2d 743, 745 (8th Cir.), *cert. denied*, 429 U.S. 1004 [97 S.Ct. 537, 50 L.Ed.2d 616] (1976). The underlying measure of adequacy in the description is whether, given the specificity in the warrant, a violation of personal rights is likely. *Johnson, supra* at 1313.

*Id.* at 245. Applying this standard, the court in *Muckenthaler* found the warrant to be constitutional because it "was as specific as possible under circumstances." *Id.*

This conclusion is equally applicable here. As indicated earlier, in contrast to a conventional Title III warrant, the roving intercept provision requires identification of the person committing the offense and whose conversation is to be intercepted. *Compare* §§ 2518(11)(a)(ii) and 2518(1)(b)(iv) (requiring the identity of the person, if known). Thus, § 2518(11)(a)(ii) provides for defining the place to be searched as the location at which an identified person is discussing specified crimes. Such a description is constitutionally sufficient in the context of this case.

Also as indicated earlier, the statute does not permit an interception until "the place where the communication is to be intercepted is ascertained." § 2518(12). The Order in this case provided that no interception was permissible until Russo, Carrozza or

Ferrara was present. Order, p. 6. In addition, the government was required to employ standard minimization procedures to assure that only criminal conversation was intercepted. § 2518(5).

In this case, and the court expects in most roving intercept cases, the subjects of the surveillance had long been under investigation and were well known to the FBI. *See* Steffens Aff. It is, therefore, unlikely that a mistake would have been made about whether one of them was present for a conversation. The FBI also had considerable information concerning individuals believed to be the targets' criminal associates. *Id.* Thus, while the exercise of some discretion was required with regard to the intercept, the government could with "reasonable efforts," *Steele*, 267 U.S. at 503, 45 S.Ct. at 416, ascertain the place where the targets were likely to be conducting the criminal conversations the government was authorized to intercept.

Similarly, the government could, without significant risk of mistake, identify the locations at which listening devices would have to be installed. Indeed, no mistake was made in this case.

Accordingly, the court concludes that the purpose to be served by the requirement that the place to be searched be particularly described was satisfied by the roving intercept provision as implemented by the Order in this case. The customary specification by means of an address was lacking, but this was permissible if the judge properly found that it was impractical to provide this information and that electronic surveillance was otherwise justified.

This conclusion represents the recognition that crime changes in response to law enforcement efforts to combat it and the Fourth Amendment "must be interpreted 'in light of contemporary' norms and conditions." *Steagald*, 451 U.S. at 217 n. 10, 101 S.Ct. at 1650 n. 10 (quoting *Payton*, 445 U.S. at 591 n. 33, 100 S.Ct. at 1382 n. 33). The decisions in *Berger* and *Katz* recognized that warrants for electronic surveillance could suffice if they were similar, but not identical, to customary warrants. The Supreme Court has reiterated and elabo-

rated this principle of flexibility regarding warrants. *Karo*, 468 U.S. at 705, 104 S.Ct. at 3298; *Almeida–Sanchez*, 413 U.S. at 266, 93 S.Ct. at 2536; *Camara*, 387 U.S. at 523, 87 S.Ct. at 1728. The roving intercept provision allows a departure from the customary description of the place to be searched when the usual specificity is shown to be impractical. In the context of this case at least, the provision satisfies the standards of the Fourth Amendment.

This analysis and conclusion is consistent with the sole district court decision addressing the constitutionality of the roving wiretap provision of Title III, §§ 2518(11)(b). *United States v. Silberman*, 732 F.Supp. 1057 (S.D.Cal.1990). In *Silberman*, the court observed that "[t]he purpose of the Fourth Amendment's particularity requirement is to ensure that a search 'will be carefully tailored to its justifications, and will not take on the character of the wide ranging exploratory searches the Framers intended to prohibit.' " *Id.* at 1061 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987)). The court recognized that the roving wiretap provision relaxed the usual specificity of the description of the places to be searched when a target was shown to be attempting to evade detection. *Id.* at 1062. In these circumstances, the court found the roving wiretap provision, in the context of Title III's many other protections, to be constitutional because it "sufficiently tailors the search it authorizes to its need." *Id.* at 1063. This conclusion is equally applicable to the roving intercept provision at issue in this case.

6. Even if the roving intercept provision is unconstitutional, the good faith exception to the exclusionary rule defeats the motion to suppress if the Warrant in this case was properly obtained.

As described in Section IV.1 *infra*, the judicially crafted exclusionary rule relating to Fourth Amendment violations applies to the execution of the roving intercept Order in this case. This exclusionary rule now includes an exception for objec-

tively reasonable reliance by a law enforcement officer upon a statute or upon a warrant if it has been properly obtained. *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

In the instant case, the FBI reasonably relied on the validity of the roving intercept provisions of Title III and on the Warrant received pursuant to those provisions. Therefore, if the manner in which the Warrant was obtained does not require suppression, the good faith exception to the exclusionary rule would operate to defeat defendants' motion to suppress the fruits of the electronic surveillance at 34 Guild Street even if the roving intercept provision of Title III was now deemed unconstitutional.

In 1984, the Supreme Court decided *United States v. Leon,* which explicitly established a good faith exception to the judicially crafted exclusionary rule for Fourth Amendment violations in the context of law enforcement officers executing warrants that issued upon mistaken findings by a magistrate of probable cause. *Leon,* 468 U.S. at 913, 104 S.Ct. at 3415. The exception was based in part on the Supreme Court's view that:

> Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants [by application of the exclusionary rule] offends basic concepts of the criminal justice system.

*Id.* at 907–08, 104 S.Ct. at 3412 (citing *Stone v. Powell,* 428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976)).

In 1987, the Supreme Court extended the good faith exception to the exclusionary rule to warrantless searches based upon statutes later declared unconstitutional. *Krull,* 480 U.S. at 349, 107 S.Ct. at 1166. *Krull* involved a warrantless administrative search of an automobile wrecking yard pursuant to an Illinois statute authorizing such searches. *Id.* at 342–43, 107 S.Ct. at 1163. The search generated evidence which the government wished to use in a

criminal prosecution. *Id.* at 344, 107 S.Ct. at 1164. Although the statute at issue was declared to violate the Fourth Amendment, the evidence was not suppressed. *Id.* at 359–60, 107 S.Ct. at 1172–73.

In deciding *Krull,* the Supreme Court explained it should be presumed that legislators act in a constitutional manner and, therefore, laws should be accorded a presumption of constitutional validity. *Id.* at 351, 107 S.Ct. at 1167–68. Thus, "(u)nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law." *Id.* at 349–50, 107 S.Ct. at 1167.

However, "a law enforcement officer [cannot] be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known the statute was unconstitutional." *Id.* at 355, 107 S.Ct. at 1170; *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Moreover, "the standard of reasonableness ... is an objective one; the standard does not turn on the subjective good faith of the individual officers." *Krull,* 480 U.S. at 355, 107 S.Ct. at 1170 (citing *Leon,* 468 U.S. at 919 n. 20, 104 S.Ct. at 3419 n. 20).

As the Supreme Court expressly recognized in *Krull,* applying the good faith exception to the exclusionary rule to reasonable reliance on statutes is inconsistent with some of its earlier rulings, including its decision in *Berger. Id.* at 355–56 n. 12, 107 S.Ct. at 1170–71 n. 12. As the Court stated, however, those cases preceded *Leon. Id.* In *Krull,* the Court indicated that any prior inconsistent decisions regarding reliance upon a statute were effectively overruled. *See Krull,* 480 U.S. at 364, 107 S.Ct. at 1174 (O'Connor, J., dissenting).

In this case, the interception of conversations was authorized by the Warrant, which was issued pursuant to the presumptively constitutional provisions of § 2518(11)(a). The agents' reliance on the Warrant and, implicitly, on the statute was reasonable. The roving intercept provisions of Title III are not "clearly unconstitutional." Indeed, this court finds them to

be compatible with the requirements of the Fourth Amendment. In any event, there were no cases addressing the constitutionality of § 2518(11)(a) at the time the FBI executed the Order in this case and it certainly cannot be said that the agents involved should have known the statute was unconstitutional.

This, however, is not the end of the inquiry concerning the issue of suppression of the communications intercepted at 34 Guild Street. As the Supreme Court explained in *Leon*, when warrants are involved, the good faith exception to the exclusionary rule relies substantially on the efficacy and integrity of the warrant process. 468 U.S. at 914, 104 S.Ct. at 3416. In *Leon*, the Court again emphasized the importance of a warrant generally, stating:

> Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime' " *United States v. Chadwick*, 433 U.S. 1, 9 [97 S.Ct. 2476, 2482, 53 L.Ed.2d 538] (1977) (quoting *Johnson*, 333 U.S. at 14 [68 S.Ct. at 369]), [the Court has] expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *United States v. Ventresca*, 380 U.S. 102, 106 [85 S.Ct. 741, 744, 13 L.Ed.2d 684] (1965).

*Id.* at 913–14, 104 S.Ct. at 3415–16.

The Court also plainly indicated, however, that it is essential that the judicial officer perform his or her neutral and detached function of deciding on a properly informed basis whether a warrant should issue. *Id.* at 914, 104 S.Ct. at 3416. Therefore, the good faith exception to the exclusionary rule "does not preclude inquiry into the knowing and reckless falsity" of the information furnished by the government to obtain the warrant. *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). "Indeed, 'it would be an unthinkable imposition upon [the judicial

officer's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.' " *Id.* at 914 n. 12, 104 S.Ct. at 3416 n. 12 (quoting *Franks*, 438 U.S. at 165, 98 S.Ct. at 2681). Accordingly, "(a) warrant that violates *Franks* is not subject to the good faith exception to the exclusionary rule announced in [Leon]." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir.1990).

It is, therefore, essential that the court address the most vexing of the many challenging issues presented by defendants' motion to suppress—the question whether suppression is required because the government failed to inform Judge Nelson of the information it had received concerning 34 Guild Street.

IV. *Suppression On The Basis Of Alleged Statutory Violations Is Not Justified*

1. Issues relating to 34 Guild Street must be analyzed under the standards of *Franks v. Delaware*.

The issue whether to suppress the intercepted evidence concerning the Mafia induction ceremony at 34 Guild Street is challenging in part because of some uncertainty concerning the standards to be utilized in deciding this question. As set forth below, analysis indicates that for the provisions of Title III which address requirements of the Fourth Amendment, the evolving constitutional law concerning suppression is applicable. Section 2518(11)(a)(ii) addresses the particularity clause of the Fourth Amendment and, therefore, constitutional standards concerning exclusion apply to issues relating to it. These standards include those established by *Franks v. Delaware*. As explained in Section IV.2, *infra*, suppression is not justified pursuant to *Franks*.

As described in Section III.3, *supra*, Title III contains certain provisions intended to implement commands of the Fourth Amendment. The statute also includes many other provisions which go beyond constitutional requirements. Over time, the distinction between these provisions

has come to make a difference concerning the applicable exclusionary rules.

18 U.S.C. § 2515 provides that intercepted oral communications are not admissible at "any trial, hearing, or other proceeding ... if the disclosure of that information would be in violation of [Title III]." A remedy for a violation of rights established by Title III is provided by § 2518(10)(a)(i), which requires suppression if the communication at issue "was unlawfully intercepted." *See United States v. Mora*, 821 F.2d 860, 865 (1st Cir.1987) ("Congress explicitly intended that § 2518(10)(a) provide the remedy for the right created by § 2515.").

When enacted in 1967, §§ 2515 and 2518(10)(a) were not intended "generally to press the scope of the suppression role beyond [then] present search and seizure law." 1968 Leg.Hist. at 2185; *Scott v. United States*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978); *United States v. Orozco*, 630 F.Supp. 1418, 1522 n. 9 (S.D.Cal.1986). At that time, there was no good faith or other exception to the judicially crafted exclusionary rule applicable to violations of the Fourth Amendment. When enacted, the primary purpose and effect of §§ 2515 and 2518(10) was to extend the exclusionary rule beyond federal criminal trials to cover federal civil actions, state criminal and civil proceedings, and federal and state grand jury proceedings. 1968 Leg.Hist. at 2185 (§ 2518 applies "across the board in both Federal and State proceeding"); *United States v. Giordano*, 416 U.S. 505, 528 n. 17, 94 S.Ct. 1820, 1833 n. 17, 40 L.Ed.2d 341 (1974). It was expected that, "(a)long with the criminal and civil remedies [of Title III § 2515] [w]ould serve to guarantee that the standards [of the statute] will sharply curtail the unlawful interception of wire and oral communications." 1968 Leg.Hist. at 2185; *Giordano*, 416 U.S. at 514 n. 6, 94 S.Ct. at 1826 n. 6.

In 1974, the Supreme Court recognized that Title III included provisions which enacted in statutory form certain Fourth Amendment imperatives and also included additional requirements intended to impose limits on the use of electronic surveillance which were not mandated by the Fourth Amendment. *See Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831. In *Giordano*, the intercepted evidence at issue was suppressed because the request for a warrant had been approved by an official of the Department of Justice who was not, under the statute, authorized to act for the Attorney General with regard to wiretaps.

The statutory requirement that only certain officials of the Department of Justice approve requests to seek warrants for wiretaps is not based upon any obligation imposed by the Fourth Amendment. Consistent with this understanding, in addressing the question of suppression, the Court emphasized that, "[t]he issue does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III." *Id.* Justice Lewis Powell was more explicit in his concurrence and dissent, stating that, "(t)o the extent that the statutory requirements for issuance of an intercept order are nonconstitutional in nature, the exclusionary rule adopted to effectuate the Fourth Amendment does not pertain to their violation." *Id.* at 558, 94 S.Ct. at 1847. The clear implication of these remarks is that for statutory requirements which *are* constitutional in nature, the judicially fashioned exclusionary rule must be applied.

In *Giordano*, the Court held that the words "unlawfully intercepted" were not limited to constitutional violations and that:

> Congress intended to require suppression where there is failure to satisfy any of those *statutory* requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

*Id.* at 527, 94 S.Ct. at 1832 (emphasis added). In doing so, the Court in effect found legislative intent to require suppression without regard to the government's good faith or the absence of prejudice to a defendant if certain statutory provisions of Title III not rooted in the requirements of the Fourth Amendment were not satisfied.

In 1977, the Court again recognized the distinction between provisions of Title III which reflect constitutional commands and those which are solely legislative in origin. *United States v. Donovan* involved the failure of the government to identify, as required by § 2518(1)(b)(iv), every person it had probable cause to believe would be intercepted in criminal conversation if a wiretap was authorized. 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The Court noted that, "(i)t is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named." *Id.* at 427 n. 15, 97 S.Ct. at 668 n. 15. Thus, the Court found, "(t)he availability of the suppression remedy for these statutory, as opposed to constitutional, violations, ... turns on the provisions of Title III rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *Id.* at 432–33 n. 22, 97 S.Ct. at 670–71 n. 22. In doing so, the Court clarified that violations of a constitutional magnitude would be governed by the judicially fashioned exclusionary rule.

In *Donovan*, the Court went on to find that, in contrast to the approval provisions implicated in *Giordano*, the naming provision at issue did not "play 'a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance.'" *Id.* at 437, 97 S.Ct. at 673 (quoting *United States v. Chavez*, 416 U.S. 562, 578, 94 S.Ct. 1849, 1857, 40 L.Ed.2d 380 (1974)). Thus, the Court declined to find the interception "unlawful," because, "(i)n no meaningful sense can it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept." *Id.* at 436, 97 S.Ct. at 672.

The Court in *Donovan*, however, was careful to state that it was not called upon to decide a case in which there was a suggestion that government agents knowingly withheld the names at issue "for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking" and, therefore, that the warrant should not issue. *Id.* at 436 n. 23, 97 S.Ct. at 672 n. 23. Thus, the Supreme Court suggested that an intentional effort to withhold *material* information might justify suppression. Similarly, the Supreme Court found it worthy of note that the defendants in *Donovan* were not prejudiced by "their failure to receive postintercept notice." *Id.* at 439 n. 26, 97 S.Ct. at 673–74 n. 26.

In 1977, the Court of Appeals for the First Circuit addressed the implications of a failure to furnish the district court with the names of individuals overheard on a wiretap who were entitled to notice of the interception under § 2518(8)(d). *United States v. Harrigan*, 557 F.2d 879 (1st Cir. 1977). Following *Donovan*, the First Circuit found that § 2518(10)(a) did not require the suppression of wiretap evidence because the duty which had been violated was imposed by a non-central, statutory provision. *Id.* at 882.

The Court of Appeals suggested, however, that the result would be different if a defendant could demonstrate incurable prejudice from not receiving notice. *Id.* at 884. In addition, the First Circuit observed that *Donovan* left open the question whether the intentional withholding of information might justify suppression, and indicated in *dicta* that, "suppression should be required when the statutory violation arose from a conscious decision by the federal authorities to violate the law."[10] *Id.*

---

10. In *Harrigan*, the First Circuit cited with approval the Ninth Circuit's decision in *United States v. Chun*, 503 F.2d 533 (9th Cir.1974). 557 F.2d at 884. In *Chun*, the Ninth Circuit stated that in deciding whether suppression was justified for a non-constitutional violation of Title III:

> *Chavez* and *Giordano* suggest that there are several important factors which should be considered. As an initial matter, it must be determined whether the particular procedure is a central or functional safeguard in Title III's scheme to prevent abuses. *Chavez, supra*, 416 U.S. at 578, 94 S.Ct. 1849 [1857]; *Giordano, supra*, 416 U.S. at 516, 94 S.Ct. 1820 [1827]. If this test has been met, it must also be determined whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error. *Chavez, supra*, 416 U.S. at 573–574, 94 S.Ct.

Thus, in *Harrigan*, the First Circuit suggested that a deliberate effort to withhold *immaterial* information might justify suppression.

Subsequently, District Judge W. Arthur Garrity, Jr. of Massachusetts, again in *dicta*, suggested that a reckless failure to comply with a non-central provision might be sufficient to trigger suppression. *United States v. Sullivan*, 586 F.Supp. 1314, 1323 (D.Mass.1984). The First Circuit has not decided whether proving reckless disregard is sufficient to obtain suppression for a violation of a non-central provision, but has determined that "mere negligence" is not enough. *United States v. Zannino*, 895 F.2d 1, 9 (1st Cir.1990).

Shortly after *Harrigan* was decided, in 1978, the Supreme Court found that even if law enforcement officers failed to make a good faith effort to comply with the minimization requirements established by § 2518(5), suppression was not appropriate if the facts and circumstances indicate the agents reasonably intercepted all calls on a particular telephone. *Scott v. United States*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). This conclusion was based, in part, on the terms of § 2518(5), in which the use of the word "conducted" was interpreted as indicating a legislative intent that the focus be on the agents' actions rather than their motives. *Id.*

More importantly, at the time *Harrigan* was decided in 1977, there had been no meaningful alteration of the judicially fashioned exclusionary rule since the enactment of Title III and, therefore, no possible distinction between the standards of that rule and of the statutory exclusionary rule embodied in § 2518(10)(a). In 1978, however,

the Supreme Court decided *Franks v. Delaware.*

Although *Franks* was not a Title III case, it directly addressed the circumstances in which evidence should be suppressed if it were alleged that the government had presented false information in an affidavit to persuade a judge that there was probable cause for the issuance of a warrant. In *Franks*, the Court held that:

> In the event that ... the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 156, 98 S.Ct. at 2676. The Court, therefore, established that when *Franks* applies a defendant must satisfy two requirements to obtain suppression based upon possible governmental misconduct in connection with obtaining a warrant: first, that the information at issue was known by the government to be false or was presented with reckless disregard for its truth; *and* second that the information was essential to the issuance of the warrant. By this formulation, the Court implicitly established a good faith exception to the judicially fashioned exclusionary rule applicable to alleged violations of the Fourth Amendment's requirement that a judicial officer properly find probable cause to issue a warrant.

In his 1974 concurrence and dissent in *Giordano*, Justice Powell foreshadowed the ruling in *Franks* and indicated that at least the second prong of that standard

---

1849 [1855–56]; *Giordano, supra,* 416 U.S. at 524–528, 94 S.Ct. 1820 [1831–33]. While in most situations it would not be necessary to reach beyond the above-mentioned factors, it may be that in some instances they will not be completely determinative. *In such cases, Chavez implicitly suggests a third factor which may have a bearing on the issue—i.e. whether the statutory requirement was deliberately ignored; and if so whether there was any tactical advantage to be gained thereby.*

*Chun,* 503 F.2d at 542 (emphasis added). This test has also been adopted in several other Circuits. *See United States v. Caggiano,* 667 F.2d 1176, 1179 (5th Cir.1982); *United States v. Diana,* 605 F.2d 1307, 1312 (4th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *United States v. Lawson,* 545 F.2d 557, 564 (7th Cir.1975); *United States v. Civella,* 533 F.2d 1395, 1400–01 (8th Cir.1976), *cert. denied* 430 U.S. 905, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977); J. Carr, *supra,* § 6.3(a), p. 6–71.

should be applied in determining the question of suppression for a violation of a provision of Title III which implements a constitutional requirement, such as a finding of probable cause. More specifically, in *Giordano* Justice Powell "agree[d] with the majority that the authorization by the Executive Assistant to the Attorney General of the application for the [original] interception order contravened 18 U.S.C. § 2516(1) and that the *statutory* remedy is suppression of all evidence derived from interceptions made under that order." *Giordano,* 416 U.S. at 548, 94 S.Ct. at 1842 (emphasis added). Justice Powell, however, dissented with regard to the suppression of evidence obtained as a result of properly authorized extensions of the original wiretap because, putting aside all evidence obtained from the invalid original wiretap order, the independent and untainted evidence submitted to the district court established probable cause. *Id.* at 549, 558–61, 94 S.Ct. at 1842, 1847–48.

Justice Powell's view in *Giordano* is significant in the context of the instant case because it signaled that the standards later established by *Franks* should be applied to questions of suppression arising from alleged violations of provisions of Title III which enact Fourth Amendment requirements. This is consistent with the position which has been adopted by the Court of Appeals for the First Circuit.[11] *See United States v. Southard,* 700 F.2d 1 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In *Southard,* the defendants alleged that a government affidavit submitted to obtain a wiretap falsely stated that informant information established probable cause to believe criminal conversations would be captured. *Id.* at 7. The Court of Appeals applied the *Franks* standard to analyze defendants' claim. *Id.* at 7–10. The motion to suppress was denied because the court found an allegedly false statement concerning unidentified callers to be true, *id.* at 9, and appellants failed to make the substantial preliminary showing with regard to allegedly false statements relating to informants which was necessary to obtain an evidentiary hearing, let alone prove bad faith. *Id.* at 10.

As described earlier, following the decision in *Southard,* in 1984, the Supreme Court decided *Leon. Leon* explicitly established a good faith exception to the judicially crafted exclusionary rule for Fourth Amendment violations and expressly anticipated reliance on *Franks* when challenges are made to an application and affidavit

---

**11.** The issues presented by the motion to suppress the electronic surveillance of 34 Guild Street in the instant case are also being litigated in the District of Connecticut, where the government seeks to use the same evidence in the prosecution of *United States v. Bianco, et al.,* No. H–90–18. This court believes that the law as interpreted by the Court of Appeals for the First Circuit is likely to be applied to issues relating to the electronic surveillance of 34 Guild Street which are raised in *Bianco* because the conduct in question occurred within the First Circuit. *See United States v. Gerena,* 667 F.Supp. 911 (D.Conn.1987).

It should be recognized, however, that courts within the Second Circuit have, like those in the First Circuit, utilized the standards of *Franks* to determine whether to suppress electronic surveillance evidence when it is claimed that a warrant was obtained improperly. *See United States v. Feola,* 651 F.Supp. 1068, 1108, 1113 (S.D.N.Y.1987) (applying *Franks* concerning issues regarding probable cause and exhaustion of alternative means of investigation), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989); *United States v. Tufaro,* 593 F.Supp. 476, 485–86 (S.D.N.Y.1983) (applying *Franks* to omission of allegedly material fact concerning probable cause), *aff'd,* 762 F.2d 991 (2d Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 84, 85, 88 L.Ed.2d 69 (1985); *United States v. Ramirez,* 602 F.Supp. 783, 788–89 (S.D.N.Y.1985).

*Franks* has also been applied in Title III cases in other Circuits. *See e.g., United States v. Garcia,* 785 F.2d 214, 222 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *United States v. Leisure,* 844 F.2d 1347, 1357 (8th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Ippolito,* 774 F.2d 1482, 1485 (9th Cir.1985); *United States v. Brooklier,* 685 F.2d 1208, 1221 (9th Cir.1982) (per curiam), *cert. denied* 459 U.S. 1206, 103 S.Ct. 1194, 1195, 75 L.Ed.2d 439 (1983); *United States v. Marcello,* 508 F.Supp. 586, 603–06 (E.D.La.1981), *aff'd sub nom. United States v. Roemer,* 703 F.2d 805 (5th Cir.), *cert. denied,* 464 U.S. 935, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983); J. Carr., *supra* § 6.2(d)(1)(A), p. 6–56 ("(T)he *Franks* standard applies to Title III applications and orders.").

seeking a warrant. *Leon,* 468 U.S. at 914, 104 S.Ct. at 3416.

As a result of *Franks* and *Leon,* by 1984 there had been considerable evolution of the judicially crafted exclusionary rule applicable to Fourth Amendment violations since the enactment of the statutory exclusionary rule in 1967 as part of Title III. Thus, a question was presented whether the current constitutional exclusionary rule or the 1967 standards would be applied in particular Title III cases.

In 1984, shortly after *Leon* was decided, the Court of Appeals for the First Circuit indicated again that the current constitutional exclusionary rule standards apply to at least some Title III cases, including those in which the issue is whether a warrant was properly obtained. *United States v. Mastroianni,* 749 F.2d 900, 909 (1st Cir. 1984). *Mastroianni* involved an alleged misrepresentation in a state wiretap application pursuant to a Massachusetts statute that paralleled § 2518(1)(c), which requires that an application for a warrant contain a full and complete statement of why other investigative techniques had failed or were not likely to succeed. *Id.* at 908; *see* Mass. Gen.Laws Ann. ch. 272, § 99(E)(3) (West 1990). More specifically, although a member of the conspiracy being investigated had agreed to cooperate five days earlier, the affiant stated that "as of this date efforts to successfully penetrate this organization and other investigative techniques have failed." *Mastroianni,* 749 F.2d at 908.

As indicated earlier, the "necessity" requirement of § 2518(1)(c) is rooted in the Fourth Amendment requirement that searches be reasonable and in the statements in *Berger* and *Katz* that courts should authorize "no greater invasion of privacy ... than necessary under the circumstances." *Berger,* 388 U.S. at 57, 87 S.Ct. at 1883; *Katz,* 389 U.S. at 355, 88 S.Ct. at 513. In analyzing a violation of the comparable necessity provision of the state statute, the Court of Appeals for the First Circuit employed the *Franks* test to determine whether the wiretap evidence at

issue ought to be suppressed. *Mastroianni,* 749 F.2d at 909.

The court in *Mastroianni* stated that it had "serious reservations about whether a magistrate would have approved the wiretap application when he did if he had been aware of [the informant's] apparent decision to cooperate." *Id.* at 909 n. 6. The evidence was not excluded, however, because the information concerning the cooperating individual was relatively recent and had not been communicated to the affiant. Therefore, the statement at issue was not shown to have been made "with knowledge of its falsity or with reckless disregard for the truth." *Id.* at 909. Thus, the First Circuit relied on the good faith prong of the *Franks* test to deny suppression in a case where the warrant would apparently not have issued, and the defendant would not have been intercepted, if the issuing magistrate had been fully informed.

In 1986, the Court of Appeals for the First Circuit again applied the *Franks* standard in the context of deciding a motion to suppress for an alleged violation of the statutory requirement of § 2518(1)(c) that the government make a full and complete statement regarding the efficacy of other investigatory techniques in order to show that a wiretap is necessary. *United States v. Cole,* 807 F.2d 262, 267 (1st Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). In *Cole,* the government failed to inform the court that one of its investigators was having an affair with a co-defendant and thus had access to certain information. *Id.* After a hearing, the district court held that the second prong of the *Franks* test was not satisfied, finding that the omitted information was not material because the warrant would "necessarily, nevertheless, have issued" even if that information had been disclosed to the issuing judge. *Id.* at 268. The First Circuit affirmed this result. *Id.* Thus, *Cole* serves to re-emphasize that the Court of Appeals for the First Circuit believes *Franks* is applicable when it is alleged that provisions of Title III which reflect constitutional requirements have been violated in the process of obtaining a warrant.

In 1986, Title III was amended in a manner which again recognizes that there is a distinction between violations of constitutional and non-constitutional provisions of that statute, and between the exclusionary rules applicable to each. To respond to the development of new technology, Congress in 1986 amended Title III to cover electronic as well as wire and oral communications. In doing so, § 2518(10)(c) was added to the statute. It provides:

> The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for *nonconstitutional* violations of this chapter involving such communications. (emphasis added).

The "remedies and sanctions" in Title III include subsection (10)(a), which was not explicitly amended to cover electronic as well as oral and wire communications.

The reference in subsection (10)(c) to "nonconstitutional" violations indicates it is the contemporary understanding of Congress and the President that the judicially crafted exclusionary rule governs conduct which violates both the Fourth Amendment and the provisions of Title III which implement its requirements. The legislative history reinforces this view. The House Report states:

> In the event that there is a violation of law of a constitutional magnitude the court involved in a subsequent criminal trial will apply the existing constitutional law with respect to the exclusionary rule. *Mapp v. Ohio*, 367 U.S. 643, 652 [81 S.Ct. 1684, 1690, 6 L.Ed.2d 1081] (1961); *Massachusetts v. Shepperd*, [468 U.S. 981], 104 S.Ct. 3424 [82 L.Ed.2d 737] (1984); *United States v. Leon*, [468 U.S. 897], 104 S.Ct. 3405, [82 L.Ed.2d 677] (1984).

H.R. No. 99–647, 99th Cong., 2d Sess., 48 (1986); 1986 Leg.Hist. 3555, at 3577.

Subsection (10)(c) has been viewed as clarifying that for oral, wire, and electronic communications "Congress has incorporat-

ed the good faith exception for violations of a constitutional magnitude." J. Carr, *supra*, § 6.3A, p. 6–84.2. To the extent that this observation includes the principles of *Franks* on which *Leon* expressly relied, this court concurs.[12]

As described previously, in 1987, the Supreme Court decided *Krull*, which reaffirmed and extended to reliance on a statute the good faith exception to the exclusionary rule enunciated in *Leon*. *Krull*, 480 U.S. at 341, 107 S.Ct. at 1162. Since then, the Court of Appeals for the First Circuit has in *dicta* again indicated that the *Franks* standard is applicable when a court is faced with allegations of factual inadequacies or misrepresentations in an application for a warrant under Title III. *United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir.1989).

The roving intercept provision of Title III, § 2518(11) relaxes the statutory requirements of §§ 2518(1)(b)(ii) and (3)(d) concerning the place where interceptions will occur. As indicated earlier, the modified provisions were intended to address the constitutional commands of particularization as they were stated in *Berger* and *Katz*.

Accordingly, defendants' motion to suppress the evidence of the Mafia induction ceremony intercepted at 34 Guild Street relates to provisions of Title III which reflect constitutional requirements and must be analyzed pursuant to the constitutional exclusionary rule—more specifically, pursuant to *Franks*. *Cole*, 807 F.2d 262; *Mastroianni*, 749 F.2d 900; *Southard*, 700 F.2d 1.

*Franks* applies to omissions from an application or affidavit, as well as to affirmative misrepresentations. *United States v. Hadfield*, 918 F.2d 987, 993 (1st Cir.1990); *Cole*, 807 F.2d at 267–68; *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir.1990).

■ The instant case in essence involves omissions, although certain uncorrected representations in Steffens' Affida-

---

12. The Court of Appeals for the Second Circuit has also recognized in *dicta* that Fourth Amendment suppression analysis may be applicable to questions arising under § 2518(10)(a). *See*

*United States v. Ojeda Rios*, 875 F.2d 17, 23 (2d Cir.1989), *vacated on other grounds*, 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990).

vit constituted misstatements. In order to obtain suppression, defendants must show by a preponderance of the evidence both that: (1) facts were omitted " 'with the intent to make, or in reckless disregard of whether they thereby made, the [application and] affidavit misleading,' " *Colkley*, 899 F.2d at 300 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir.1986)); and (2) that such omitted facts were material. *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676; *United States v. Melvin*, 596 F.2d 492, 499–500 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *Mastroianni*, 749 F.2d at 909; *Southard*, 700 F.2d at 9–10; *Cole*, 807 F.2d at 268; *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.1985) ("(F)alse statements that are material in causing the warrant to issue will invalidate it.").

With regard to the first prong of the *Franks* test, "*Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*" a judge. *Colkley*, 899 F.2d at 301 (emphasis in original). Mere negligence is not enough. *Id.*

With regard to the second prong of the *Franks* test, the information must be material to the issuance of the warrant. As the parties and the court agree, materiality should be evaluated by an objective standard and from the perspective of a reasonable judge.

In this context, the Court of Appeals for the First Circuit has indicated that information is not "material" if a warrant would "necessarily, nevertheless, have issued" if the information had been accurately and completely disclosed. *Cole*, 807 F.2d at 268; *see also United States v. LaRouche Campaign*, 695 F.Supp. 1290, 1305 (D.Mass.1988), *aff'd*, 866 F.2d 512 (1st Cir. 1989); *United States v. Ippolito*, 774 F.2d 1482, 1486, 1487 (9th Cir.1985) (If a reasonable district judge "could have denied" the application if fully informed, the information is material; but if the omitted information or misstatement "would have no ef-

fect" on the issuance of a warrant, it is immaterial.); *United States v. Sobamowo*, 892 F.2d 90, 93–94 (D.C.Cir.1989) (suppression denied because of "no cause to believe" that omitted information "if known to the district judge, would have altered the district court's determination" to issue the warrant), *cert. denied*, —— U.S. ——, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990); *United States v. Massino*, 657 F.Supp. 101, 107 (S.D.N.Y.1987) ("Suppression is mandated if, with the additional information, the issuing judge would not have found the requisite elements ...").

■■■ Thus, this court understands "material information" to be information which reasonably might have prompted a district judge being asked to issue the warrant to have denied the request. If a reasonable judge either might or might not have authorized the requested electronic surveillance if fully informed, the information at issue is material, and its omission requires suppression. If, however, a reasonable judge would have authorized the electronic surveillance anyway, suppression is not appropriate.

The government contends that this formulation of "materiality" is more favorable to the defendants than the standard established by *Franks*. *See* Government's Supplemental Memorandum of Law Concerning Title 18, United States Code, Section 2518(11)(a)(ii) filed March 18, 1991. The government asserts that "the defendant has the burden of showing that if the information at issue had not been omitted from the supporting affidavit, the issuing court's determination would *necessarily* have been different." *Id.* at 7 (emphasis added).

The government's position is based in part on the language in *Franks* stating that a defendant must prove by a preponderance of the evidence that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish" a proper basis for issuing the warrant. 438 U.S. at 156, 98 S.Ct. at 2676.[13] In *Colkley*, the Fourth Circuit de-

---

13. The government also relies in part on the language in *Franks* concerning presumed validity of an affidavit supporting a request for a

search warrant. 438 U.S. at 172, 98 S.Ct. at 2684–85. This reliance, however, is misplaced. *Franks* indicates it is appropriate to presume an

scribed the implications of this element of the *Franks* test as follows:

> The district court misstated the type of materiality that *Franks* requires. It believed that the affiant's omission was material because it "may have affected the outcome" of the probable cause determination. However, to be material under *Franks,* an omission must do more than potentially affect the probable cause determination: it must be "necessary to the finding of probable cause." *Franks,* 438 U.S. at 156, 98 S.Ct. at 2676. For an omission to serve as the basis for a hearing under *Franks,* it must be such that its inclusion in the affidavit would defeat probable cause for arrest. *See Reivich,* 793 F.2d at 961. Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing. *Id.* at 962.

899 F.2d at 301.

Similarly, in *Reivich,* the Eighth Circuit reversed an order of suppression based on a finding that the omitted facts concerning probable cause "might have changed the decision of the judicial officer issuing the warrant." 793 F.2d at 962. Rather, the Eighth Circuit suggested the relevant question is whether the supplemented or corrected affidavit *"could not"* have supported issuance of the warrant. *Id.* (emphasis in original). Thus, the Eighth Circuit found suppression to be unjustified because an affidavit including the omitted information "still would have supported a finding of probable cause." *Id. See also United States v. Paredes–Moya,* 722 F.Supp. 1402, 1414, n. 11 (N.D.Tex.1989) (questioning whether the Ninth Circuit in *Ippolito* "meant to establish so lenient a footing for suppression as to be guided by what a reasonable judge *could* do.") (emphasis in original), *aff'd in part and rev'd in part, United States v. Guerra Marez,* 928 F.2d 665 (5th Cir.1991).

There is, therefore, some support for the government's claim that *Cole* imposes a higher standard than *Franks* in holding

that omitted information is not material only if "the warrant, necessarily, [would] have issued" if that information had been disclosed. *Cole,* 807 F.2d at 268. The formulation of materiality used by this court, however, implements and amplifies the standard *Cole* indicates is appropriate. The government, however, has not been prejudiced if this standard is higher than contemplated by *Franks* because, as set forth in the following section, this standard is satisfied in this case.

2. Suppression on the basis of a violation of § 2518(11)(a)(ii) is inappropriate because neither of the *Franks* requirements has been satisfied.

As indicated earlier, the government erred in not telling Judge Nelson on October 27, 1989, of the information it had recently received regarding 34 Guild Street as the possible site for an imminent Mafia induction ceremony. Thus, the question whether to suppress the conversations intercepted at 34 Guild Street must be analyzed under *Franks.* This analysis demonstrates that exclusion of the evidence at issue is not justified: (1) because the government's omissions and misstatements were not intended to mislead the court, and were not made with reckless disregard for the truth of the Application or the Steffens' Affidavit; and (2) because the omissions and misstatements were not material.

■■■ Prior to the time it had information concerning the actual location of the possible Mafia induction ceremony, it was within the government's discretion not to tell the court it hoped to capture such a ceremony if a roving intercept warrant was issued. With regard to establishing that there is probable cause for the issuance of a warrant, the government must make "a full and complete statement of the facts and circumstances *relied upon by the applicant,* to justify his [or her] belief that an order should be issued." § 2518(1)(b) (emphasis added). Thus, the government has

---

affidavit is valid for the purposes of deciding whether a defendant has made a sufficiently specific challenge to its truth to obtain an evidentiary hearing. Where, however, it is shown

that there are misstatements or omissions concerning an affidavit, *Franks* does not suggest these imperfections should be presumed to be immaterial.

some discretion to rely upon and disclose less than all of its evidence tending to establish probable cause, as long as there is no effort to mislead the court into approving a warrant which might otherwise not have been issued.

In this case, at the FBI's request, neither the Application nor Steffens' Affidavit were drafted to include any mention of the possible interception of a Mafia induction ceremony because of the government's interest in providing maximum protection for the confidentiality of its informants. The government did not decide to withhold this information because it was concerned that there might be problems with obtaining or executing the warrant if the judge were informed that it might be used to intercept the induction of new members in the Patriarca Family. Initially, it was a legitimate exercise of the government's discretion not to mention the possible induction ceremony.

By the afternoon of Friday, October 27, 1989, however, the government had probable cause to believe an induction ceremony would occur on October 29, 1989 at 34 Guild Street—as well as substantial reasons to be skeptical about whether this would occur. The information concerning 34 Guild Street was relevant to whether it was practical to describe in conventional terms a place where communications were to be intercepted, § 2518(1)(b)(ii), and whether there was probable cause to believe that such place was about to be used in connection with an offense for which Title III surveillance could be authorized, § 2518(3)(d).

In contrast to the requirements concerning probable cause, the government's obligation to make a "full and complete statement" concerning the practicality of specifying the place or places to be bugged is unqualified; the government is obligated to inform the court of all of its information relating to this issue. Thus, in this case the government had a duty to revise or supplement the Application and Steffens' Affidavit it had furnished informally to Judge Nelson for his review in order to advise him of the recently obtained information concerning 34 Guild Street. *See Mastroianni*, 749 F.2d at 910 ("(T)he magistrate should have been informed of the new development in the case."); *United States v. Marin–Buitrago*, 734 F.2d 889, 894 (2d Cir.1984).

Even where, as here, the omitted information is not material, it is important that the government satisfy its obligation to make a full and complete statement concerning the practicality of specifying in conventional terms a location to be bugged pursuant to the requested warrant. As described earlier, the roving intercept provisions of Title III—and their constitutionality—rely in meaningful measure on an independent judicial officer, rather than a law enforcement officer engaged in the competitive business of combatting crime, deciding that it is reasonable, necessary, and appropriate to relax the usual particularity requirements of the statute. *See Marin–Buitrago*, 734 F.2d at 894. The court in this case did not have an opportunity to make the fully informed decision on this issue which § 2518(11)(a) contemplates.

Accordingly, the implications of this imperfection in the government's conduct must be analyzed under *Franks*. To facilitate this analysis, the court permitted the defendants to examine Kottmyer regarding her reasons for not telling Judge Nelson on October 27, 1989, about 34 Guild Street. The reasons for allowing this examination were stated in the court's Order dated March 22, 1991 and amplified orally at the outset of the proceedings on March 25, 1991.[14]

---

14. On February 28, 1991, the court ordered the interrogation of Kottmyer on several issues. The government filed a substantial memorandum urging reconsideration on the basis that the *Franks* standard for obtaining a hearing had not been satisfied and that unwarranted examination of Kottmyer on some issues could jeopardize the confidentiality and safety of informants. The defendants opposed the motion to reconsider. After several hearings, the court granted the government motion to reconsider on some issues because the standards of *Franks* to obtain a hearing were, for those issues, not met. The court, however, again decided to allow the examination of Kottmyer on the most critical contested issue—the question of the failure to inform Judge Nelson concerning 34 Guild Street. *See* Order dated March 22, 1991.

At the time the court ordered Kottmyer's testimony, it was not clear to the court that *Franks*, rather than *Giordano* or the framework utilized in *Chun*, see note 10, *supra*, should govern the disposition of defendants' motion to suppress; the applicability of *Franks* has since become evident.[15] More importantly, however, the court had discretion whether to hold the hearing, *See United States v. LaRouche Campaign*, 682 F.Supp. 610, 621–22 (D.Mass.1987); *Mastroianni*, 749 F.2d at 910 (The court did not abuse its discretion in denying defendants a *Franks* hearing). The court decided it was most appropriate to permit defendants' counsel to cross-examine Kottmyer. The reasons for this included the following.

The government not only failed to inform Judge Nelson of the information it had received regarding 34 Guild Street prior to his issuance of the Warrant, it also did not initially inform the defendants or this court that it had such information. The government's initial memorandum opposing the motion to suppress addressed the issue whether the court should have been furnished with information concerning 34 Guild Street acquired *after* the warrant issued, but did not disclose all of the relevant facts in this case.[16] Although the

government corrected and completed the record when invited by the court to file affidavits concerning when it first learned of 34 Guild Street as the possible location for the ceremony, the government's initial lack of candor was—and remains—disturbing to this court.

State of mind is an essential element of the *Franks* test, and defendants had no means of challenging or providing evidence concerning Kottmyer's state of mind without examining her. *See Franks*, 438 U.S. at 165, 98 S.Ct. at 2681. Thus, the court felt the government's conduct raised a sufficiently substantial question concerning its good faith to afford the court discretion as to whether a *Franks* hearing on the issue of 34 Guild Street should be granted.

This exercise of the court's discretion was influenced by the potential importance of the court's decision concerning the government's motives and the related desire to make that decision on a well-informed basis. This court also felt that a thorough record would be of assistance to any reviewing court and would likely encourage greater deference to this court's findings of facts. *Cole*, 807 F.2d at 268 ("In reviewing findings made after a *Franks* hearing, [the First Circuit]

---

**15.** Ironically, although the government vigorously resisted having Kottmyer testify, it was in the argument following her interrogation that the government most effectively communicated that the First Circuit had regularly employed *Franks* analysis in its relevant Title III decisions.

**16.** The government in its initial memorandum concerning § 2518(11)(a)(ii) addressed the issue concerning constitutionality as it was posed by the defendants, without disclosing to the defendants or the court facts, solely known to the government, that would obviously strengthen defendants' arguments. More specifically, the government's memorandum stated:

"In spite of the demonstrated showing in the Affidavit, the defendant Patriarca argues that because the government installed the bug at 34 Guild Street the night before the interceptions occurred, designation of the location pursuant to § 2518(1)(b)(ii) was not impractical and the government should have applied for a standard Title III order identifying 34 Guild Street as the location to be searched. Without any support in the language of the statute, *the defendant argues that the government is required to apply for a standard Title III order if, after the issuance of a roving order but before its imple-*

mentation, the government learns, less than twenty-four hours in advance of a meeting, the intended probable location. In the first instance, this argument does not negate the probable cause and impracticality information that was presented to the court on October 27. Second, the statute contains no restrictions or limitations of the kind suggested by the defendant. In addition to there being no support in the statute for the defendant's position, it is clear from the language of the statute that Congress recognized that, as a practical matter, prior knowledge of the location must exist in order to effectively utilize the authorization in a roving order; it is self-evident that equipment must be installed before conversations can be intercepted and, *ipso facto*, in every case involving implementation of a roving order, there must be advance knowledge on the part of investigating agents of the intended location of a meeting." Government's Response to Defendants Patriarca's and Ferrara's Motions to Suppress All Evidence Derived From Oral Intercept Order in MBD 89–1015 and to Dismiss the Indictment, filed January 2, 1991 (Docket #404) at 20–21.

appl[ies] a clearly erroneous test."). As the parties estimate that a complete trial of this case will take a year or more, it is particularly desirable that important issues be explored thoroughly and decided correctly to minimize the possibility that a retrial will be required.

Finally, the court was encouraged to allow a hearing as a matter of fairness to the defendants. Absent the evidence intercepted at 34 Guild Street there may not be a prosecutable case against some of the defendants, including Raymond Patriarca, the alleged "Boss" of the Patriarca family. The government contends that some of the other defendants may, under the Sentencing Guidelines, face up to life sentences if convicted in this case. Thus, it appeared appropriate for the court to be liberal in exercising its discretion as to whether defense counsel should be allowed to question Kottmyer.

The examination of Kottmyer, however, served primarily to provide added evidence of her good faith. As described earlier, the court concludes that Kottmyer acted in complete good faith, without any intention to mislead Judge Nelson. Nor did she act with reckless disregard for the truth or for the government's legal obligations.

Contrary to defendants' contentions, Kottmyer did not initially or ultimately fail to inform Judge Nelson of the possible Mafia induction ceremony because of a concern that it would involve associational activity protected by the First Amendment. This claim or consideration simply did not occur to her.

When the Application and Steffens' Affidavit were drafted, Kottmyer interpreted the roving intercept requirement that the government provide a full and complete statement concerning the practicality of specifying a location to be bugged, § 2518(11)(a)(ii), to be synonymous with the parallel provision pertaining to roving wiretaps which requires a showing that the proposed target is intentionally attempting "to thwart interception by changing facilities," § 2518(11)(b)(ii). As discussed in Section III.3, *supra,* the legislative history suggests that the requirements of the two

provisions are "substantially similar," 1986 Leg. Hist. at 3586, and that a case in which a target is trying to evade surveillance would justify roving electronic surveillance as well as a roving wiretap.

As of October 29, 1989, there were no cases interpreting the roving intercept or wiretap provisions of Title III. It was then reasonable for Kottmyer to believe the requirements to obtain both were the same; indeed, this court initially shared that view.

■ On intense and prolonged analysis, however, this court concludes that view is wrong. The roving wiretap provision focuses the court's inquiry on whether a proposed target is trying to thwart surveillance; the roving intercept provision requires consideration of whether, without regard to a target's state of mind or efforts, it is practical to specify in conventional Title III terms a place to be bugged. This statutory distinction may seem illogical. However, "(t)he life of the law has not been logic: it has been experience." O.W. Holmes, Jr., *The Common Law* at 1 (1881). Nevertheless, although the court now concludes that the government's interpretation of what § 2518(11)(a)(ii) required was incorrect, given the pace at which the issue had to be analyzed and the ambiguity of the law, the government's interpretation of what it was obliged to tell Judge Nelson was reasonable rather than reckless.

In any event, Kottmyer did not withhold the information concerning 34 Guild Street to obtain a tactical advantage. Indeed, as Kottmyer later observed, disclosure would have strengthened the government's showing that the targets were trying to frustrate efforts to intercept their communications.

Kottmyer, however, only consciously considered the information concerning 34 Guild Street in the context of the proposed Order's requirement that she inform the court, if possible, prior to any entry to install a listening device. As she was on October 27, 1989 skeptical about whether the government would decide to make an entry at 34 Guild Street, she did not tell Judge Nelson about that location. However, her notice to him of the possibility of

an entry that weekend indicates that she was not trying to mislead the judge. *See Hadfield*, 918 F.2d at 993 ("It would be arrant nonsense to argue that [the affiant], if he were trying to deceive [the judge], would nonetheless have attached the diagram to the affidavit."). Rather, she acted in complete good faith.

In these circumstances, defendants have failed to satisfy the first prong of the *Franks* test. The motion to suppress must, therefore, be denied.

The defendants, moreover, have also failed to satisfy the second essential element of the *Franks* test because the misstatements and omissions now at issue were not material. Rather, the court finds that if the misstatements in the Steffens' Affidavit had been corrected and all of the government's information concerning 34 Guild Street had been shared with Judge Nelson, he, like any reasonable judge, would nevertheless have authorized electronic surveillance of 34 Guild Street, either by signing the proposed Order authorizing the roving interception in its original form or by amending it to add express authorization for 34 Guild Street, as well as other, unspecified locations.

At the hearing on March 14, 1991, the parties stipulated that the issue of materiality should be resolved on the written record, without regard to any testimony by Kottmyer. The court agreed.

Based on that record, defendants argue, in essence, that a reasonable judge presented by the government with a proposed warrant for electronic surveillance will either adopt the Order in the form furnished or reject it in its entirety. *See, e.g.*, Supplemental Memorandum II in Support of Defendant [Patriarca's] Motion to Suppress Oral Intercepts Resulting from M.B.D. No. 89–1015 at 4–8. On this assumption, the defendants argue that a reasonable judge, fully informed about 34 Guild Street, could have rejected the proposed Order. *Id.* Thus, they assert, the Application was materially false, or materially misleading, and suppression is required.

Defendants' claim concerning materiality, however, mistakes the manner in which reasonable judicial officers discharge their duties when asked to issue warrants. Reasonable judges take seriously their responsibility to render independent judgments in reconciling privacy interests and the legitimate needs of law enforcement. Title III recognizes this. The statute expressly provides that, "(t)he judge may require the applicant to furnish additional testimony or documentary evidence in support of [an] application." § 2518(2). The statute also clearly contemplates that a judge may decide to issue a warrant, but modify the terms proposed by the government. § 2518(3) ("(T)he judge may enter an ex parte order, as requested or as modified ...").

In this case, if on October 27, 1989, a reasonable judge had been told that information provided by a cooperating individual, by the Federico furlough application, and by the surveillance at 34 Guild Street suggested that there might soon be a Mafia induction ceremony at that address, but was also informed of the efforts which Russo, Carrozza, and Ferrara had used to evade surveillance and the other substantial reasons for the government's skepticism about whether 34 Guild Street would actually be used for such a ceremony, that judge would not have rejected the government's request for a roving intercept warrant. Rather, a reasonable judge would have viewed the possible use of 34 Guild Street as added evidence of the proposed targets' efforts to thwart interception. Some such judges would have endorsed the roving Order in the form proposed by the government. Others would have amended it to make specific findings and authorize interceptions at 34 Guild Street, along with other then unknown locations. However, no reasonable judge presented on a Friday evening with an Application providing probable cause to believe that there would be an opportunity to intercept a Mafia induction ceremony that weekend would have rejected the request for a roving warrant and run the risk that chance would be lost while the government attempted to revise its submission.

This conclusion is reinforced by Judge Nelson's conduct in this case. The judge was informed that interceptions might occur that weekend and that he would be notified in advance if possible. Although this statement suggested the government had information concerning the possible location of an in imminent meeting which was not included in its papers, Judge Nelson did not request any elaboration. Evidently, he did not view this information as material.[17]

As this analysis suggests, the court concludes that Steffens' Affidavit contained ample evidence indicating that Russo, Carrozza, and Ferrara were attempting to thwart surveillance and that it was not practical to specify each of the places they were likely to have incriminating conversations in the next 30 days. In addition, while on the evening of October 27, 1989, there was probable cause to believe conversations would be intercepted at 34 Guild Street, there were also compelling reasons to believe that address would not be used and any LCN induction ceremony would be held elsewhere.

Contrary to defendants' contentions, in these circumstances the court was not legally or practically precluded from revising the government's proposed form of Order to, in effect, issue a conventional Title III warrant for 34 Guild Street while it was being used by Russo, Carrozza and Ferrara, and also granting roving authority for interceptions at other locations they might employ for incriminating discussions. As described in detail earlier, the Supreme Court has recognized that flexibility concerning the content of warrants is necessary and appropriate in certain, special circumstances. In this case, a warrant allowing interceptions at 34 Guild Street and other locations used by the Order's targets would have fully served the purposes of the Fourth Amendment. The issuance of the roving intercept Order in the form orig-

inally proposed by the government would also have been justified by the compelling reasons to doubt that 34 Guild Street would actually be used for any or all of the communications the government had probable cause to believe would occur and hoped to intercept. Therefore, as the government has not been shown to have intentionally or recklessly misled the court, and because a roving warrant explicitly or implicitly authorizing interceptions at 34 Guild Street would have issued even if the judge had been fully informed, defendants' motion to suppress on the basis of a violation of § 2518(11)(a) must be denied.

3. The Government was not required by § 2518(1)(c) to disclose in its Application the electronic surveillance matters concerning Bianco and Milano.

As described in the findings of facts, *supra,* Kottmyer's Application and Steffens' Affidavit did not disclose that essentially the same information they contained had recently been used to obtain a warrant from a district judge in Springfield, Massachusetts for electronic surveillance of the automobile of Gaetano Milano, another alleged member of the Patriarca Family being investigated in connection with many of the same crimes as Russo, Ferrara, and Carrozza, including the Grasso murder. Nor did the government inform Judge Nelson that an authorization for a roving intercept was being simultaneously sought in Rhode Island to investigate Bianco's involvement concerning the same matters.

The defendants assert that these omissions violated § 2518(1)(c) by failing to include a full and complete statement why the Gaetano Milano electronic intercept order and/or the Nicholas Bianco roving electronic intercept order could not be used to investigate the activities of Russo, Ferrara, and Carrozza, thus making "other investigative procedures" likely to succeed. This contention, however, is incorrect.

---

**17.** As a practical matter, having presided at the lengthy trial of Gennaro Angiulo, at which the Patriarca Family was proved to be a RICO enterprise, Judge Nelson was familiar with the difficulty of obtaining evidence of organized crime generally and of the prior history of the

Patriarca Family. *See Angiulo,* 897 F.2d at 1178. Thus, Judge Nelson was especially likely to have authorized the possible interception of the induction ceremony if he had been informed of it.

■ As set forth below, § 2518(1)(c) has traditionally been interpreted as requiring only a showing that non-Title III investigative techniques are not likely to succeed. Section § 2518(11)(a) does not manifest any intention to alter this interpretation of § 2518(1)(c). Rather, a judge asked to issue a roving intercept warrant must now address two distinct questions: (1) whether electronic surveillance is necessary because less intrusive investigative techniques are not likely to succeed; and, if so, (2) whether it is impractical to designate the address at which certain conversations may be intercepted.

In addition, even if § 2518(1)(c) had been violated, suppression would be inappropriate because the information concerning the efforts to intercept communications of Milano and Bianco were not omitted in order to mislead Judge Nelson and were not, in any event, material to the issuance of the Order.

The Milano order was authorized in Springfield on October 25, 1989, and the Bianco order was authorized in Rhode Island on October 27, 1989, after the Order in the instant case had been issued. Kottmyer was directly involved in both the Milano and Bianco applications. No interceptions were ever made pursuant to either the Milano or Bianco orders despite efforts on the part of the FBI to execute them. Kottmyer Supp.Aff. at ¶ 11.

Section 2518(1)(c) provides as follows:
Each application shall include the following information: (c) a full and complete statement as to whether or not *other investigative procedures* have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. (emphasis added).

Its counterpart, § 2518(3)(c) requires that: the judge determine[ ] on the basis of the facts submitted by the applicant that: (c) *normal investigative procedures* have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. (emphasis added).

Thus, these provisions use the terms "other investigative procedures" and "normal in-

vestigative procedures" interchangeably. As explained previously, these necessity provisions are rooted in the Fourth Amendment's requirement that searches and seizures be reasonable, and the statements in *Berger* and *Katz* that invasions of privacy be no greater than necessary under the circumstances.

■ The First Circuit has held that under subsections (1)(c) and (3)(c), the government is required to " 'make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls.' " *United States v. Uribe*, 890 F.2d 554, 556 (1st Cir.1989) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1306–07 (1st Cir. 1987)); *see also United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir.1989). The First Circuit has also held that the purpose of the necessity requirement is " 'to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.), (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974)), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

■ Thus, First Circuit precedent indicates that the necessity provisions of Title III require the government to address only the efficacy of non-electronic surveillance procedures. In *Hoffman*, the court listed the traditional techniques employed by the DEA as including use of confidential informants, visual surveillance, pen registers, and telephone toll records. *Hoffman*, 832 F.2d at 1307. The court then concluded that it was not error for the district court to authorize electronic surveillance. *Id.* In *Uribe*, the court upheld the wiretap as the defendants failed to "convincingly suggest what else, short of electronic surveillance, the FBI might fruitfully have attempted to further the probe." *Uribe*, 890 F.2d at 557.

Prior to the enactment of the roving intercept provision in 1986, other Circuits had also indicated that subsections (1)(c) and

(3)(c) only apply to non-electronic techniques. The Sixth Circuit held that under these provisions "(a)ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985). Similarly, the Eleventh Circuit had held that these provisions are intended "to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir.1984) (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978)), *cert. denied*, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985).

The legislative history further supports the conclusion that (1)(c) addresses non-electronic techniques solely. It states:

> Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

1968 Leg. Hist. at 2190.

The existence of § 2518(1)(e) in Title III reinforces the view that subsection (1)(c) was not intended to compel disclosure of other authorized Title III surveillance. Subsection (1)(e) reflects the understanding that other efforts to engage in electronic surveillance could properly affect a decision whether to issue a requested Title III warrant. The statute addresses this point by requiring in subsection (1)(e) disclosure of all previous Title III applications concerning persons specified in the pending application. Limiting disclosures concerning other efforts at electronic surveillance to persons specified in the application is consistent with the principal that "(e)lectronic surveillance may be permissibly employed against certain members of a criminal organization even though concrete evidence against other members has already been gathered." *Massino*, 657 F.Supp. at 108 (quoting *Orozco*, 630 F.Supp. at 1511, which cites *United States v. Bailey*, 607 F.2d 237, 242 (9th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980); *United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir.1984); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981)).

In any event, defendants do not contend that the Fourth Amendment requires disclosure of other efforts to intercept communications concerning particular crimes. The question presented is one of statutory interpretation. The express language of both subsections (1)(c) and (1)(e)—as well as the cases interpreting subsection (1)(c)—indicate that subsection (1)(c) requires disclosure only of "normal," non-Title III investigative techniques.

The enactment of the roving intercept provisions of § 2518(11)(a)(ii) did not alter the requirements of § 2518(1)(c). Subsection (11)(a) expressly modifies subsections (1)(b)(ii) and (3)(d). If the 1986 amendments were intended to revise subsection (1)(c) when a roving intercept was involved, that subsection too could and would have been addressed directly. It was not. Thus, the court concludes that in the instant case subsection (1)(c) did not require that the Application disclose the efforts to intercept Bianco or Milano.[18]

■ In addition, even if the failure to include the Milano and Bianco matters in the Application violated subsection (1)(c), suppression would not be justified under

---

**18.** Kottmyer stated that she did not include the Milano or Bianco matters in her Application because she did not want to risk disclosure of those surveillances before they were complete through the anticipated arrests of Russo, Ferrara, and Carrozza and the subsequent disclosure of the Application and Steffens' Affidavit in this case. *Kottmyer Supp. Aff.* ¶ 10. This was a permissible exercise of discretion. It may, however, in other matters be appropriate for the government to disclose other efforts to intercept communications even though this would exceed what subsection (1)(c) requires.

*Franks.* The evidence indicates that these matters were not disclosed because Kottmyer had a good faith belief such disclosure was not legally required and it was in the best interests of the investigation not to divulge them gratuitously. Kottmyer did not deliberately attempt to mislead Judge Nelson on this issue. Nor did she act with reckless disregard for the truth or for the government's obligations.

Moreover, even if the Milano and Bianco matters had been included in the Application, the roving Order would nevertheless have issued anyway. The government had probable cause to believe many people were involved in the crimes under investigation, including the Grasso murder. There was no evidence indicating that Ferrara, Russo, or Carrozza would be intercepted in Milano's automobile. Nor was the government required to choose between targeting Bianco and the three individuals in Massachusetts; all four could have been named in the same roving warrant if Bianco had operated in Massachusetts rather than Rhode Island.[19] It was permissible for the government to investigate all of the targets simultaneously. Thus, disclosure of the efforts to intercept Milano and Bianco would not have caused a reasonable judge to reject the request for the roving intercept Order at issue in this case.

Accordingly, defendants' claims arising out of the efforts to intercept communications involving Milano and Bianco do not provide a basis for suppressing the evidence obtained from the electronic surveillance of 34 Guild Street.

4. The Application should have disclosed prior requests for electronic surveillance concerning additional individuals, but this error does not justify suppression.

The defendants contend that by failing to provide the prior electronic surveillance applications of those individuals named in the Application other than Russo, Ferrara, and Carrozza, the government violated 18 U.S.C. § 2518(1)(e). This is another question of first impression. This court concludes that defendants are correct and that the government failed to meet its obligations under subsection (1)(e).

Defendants also assert that this violation of subsection (1)(e) requires suppression of the communications intercepted at 34 Guild Street. This contention, however, is not correct. The disclosure of prior applications required by subsection (1)(e) goes beyond the requirements of the Fourth Amendment. It is, therefore, subject to the statutory exclusionary provisions of §§ 2515 and 2518(10), as interpreted by the Supreme Court in *Giordano, Chavez,* and *Donovan.* Subsection (1)(e) constitutes a non-central provision of Title III. As the court finds the government's failure to comply with the requirements of subsection (1)(e) to have been a good faith, inadvertent error, suppression is not permissible or appropriate.

More specifically, § 2518(1)(b)(iv) requires that an application contain a full and complete statement of "the person, if known, committing the offense [which justifies Title III surveillance] and whose communications are to be intercepted." § 2518(1)(b)(iv). The Supreme Court has interpreted this provision to mean that an application "must name an individual if the government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations." *Donovan,* 429 U.S. at 428, 97 S.Ct. at 668. Thus, for the purposes of subsection (1)(b)(iv), the Court has determined that it is insufficient to identify only the principal target of a requested warrant if there are other known individuals whose incriminating communications are expected to be intercepted. *Id.* at 424–25, 97 S.Ct. at 666–67.

---

**19.** The issuing judge may authorize interceptions "within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction)." § 2518(3).

Section 2518(1)(e) requires that an application for a Title III warrant include a full and complete statement of facts concerning the prior applications to intercept any person specified in the application.

In this case, the Application sought authorization to conduct roving electronic surveillance of Russo, Ferrara, and Carrozza. These three individuals were defined by the government as the "principals" the roving warrant sought to target. Steffens Aff. ¶ 2. The Application further stated and there was probable cause to believe Angelo Mercurio, Frank Imbruglia, Raymond Patriarca, Nicholas Bianco, Matthew Guglielmetti, Jr., Gaetano Milano, Frank Pugliano, Louis Failla, John Castagna, and John Farrell were also engaged in the enumerated offenses. Application ¶ 5(a)–(d). The Application went on to assert, however, only that there was probable cause to believe that Russo, Ferrara, and Carrozza would be intercepted at various and changing locations if the roving Warrant issued. *Id.* at ¶ 5(e). The proposed Order drafted by the government and entered by Judge Nelson made the same distinction between the many named individuals there was probable cause to believe were engaged in the enumerated crimes and the three targets there was probable cause to believe would be intercepted discussing those crimes at various different locations. *Compare* Order ¶¶ 1 to 4 with ¶ 5.

The government, in Steffens' Affidavit, disclosed only prior applications to intercept Russo, Ferrara, and Carrozza. This reflected Kottmyer's belief that it was only necessary to provide such information concerning persons named as principals in the Application. Kottmyer Aff. ¶ 4.

The Application and Steffens' Affidavit did not, however, mask the fact that prior applications for all of the individuals named in the Application were not being disclosed. The Application stated that the Steffens' Affidavit "contains a full and complete statement of the facts concerning all previous applications.... [concerning] JOSEPH H. RUSSO, VINCENT M. FERRARA, and ROBERT F. CARROZZA." Application ¶ 7. Steffens' Affidavit plainly stated that he was providing information concerning prior applications for "the persons named as principals in this affidavit." Steffens Aff. ¶ 5.

In this case it may be arguable whether any individuals other than Russo, Ferrara, and Carrozza had to be named in the Application pursuant to subsection (1)(b)(iv). The answer to this question depends on whether the government had probable cause to believe a person was engaged in the criminal activity under investigation and was expected to be intercepted. *Donovan*, 429 U.S. at 428, 97 S.Ct. at 668. In view of the fact that at the time the Application was signed by Judge Nelson the government had probable cause to believe it would soon intercept a Patriarca Family induction ceremony, it may have had probable cause to believe at least some of those named as co-conspirators in the Application in addition to Russo, Ferrara, and Carrozza would be intercepted.

In any event, where, as here, the government has decided to name in its Application individuals believed to be co-conspirators of the proposed principal targets of an interception order, it has an obligation to inform the issuing judge of all prior requests for authority to intercept communications of those individuals. The language of subsection (1)(e) is unqualified; it demands disclosure of all prior applications "involving any of the same persons ... specified in the application." § 2518(1)(e). The roving intercept provision, § 2518(11)(a), does not alter this requirement. Moreover, the Supreme Court in *Donovan* rejected the government's effort to make a distinction between "principals" and other suspects in the context of the naming requirement of subsection (1)(b)(iv). This conclusion is also appropriate with regard to the prior application disclosure requirement of subsection (1)(e).

The Supreme Court's analysis in *Donovan*, however, indicates that the government's failure to disclose prior applications concerning individuals other than Russo, Carrozza, and Ferrara is not a basis for suppression in this case. As explained previously, in *Donovan* the Court expressly

found that "(i)t is not a constitutional requirement that all of those likely to be overheard engaging in incriminating conversations be named." 429 U.S. at 427 n. 15, 97 S.Ct. at 668 n. 15. Thus, the statutory exclusionary provisions of Title III were applied in *Donovan. Id.* at 432 n. 22, 97 S.Ct. at 670 n. 22. The Court denied the request to suppress in *Donovan* because the naming requirement of subsection (1)(b)(iv) was deemed not "to play 'a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance,'" *id.* at 437, 97 S.Ct. at 673 (quoting *Chavez,* 416 U.S. at 578, 94 S.Ct. at 1857), and the violation of the statute was inadvertent. *Id.* at 436 n. 23, 97 S.Ct. at 672 n. 23.

Violations of the prior application disclosure requirement of subsection (1)(e) must be analyzed for suppression purposes in the same manner as violations of the naming requirement of subsection (1)(b)(iv). *United States v. Van Horn,* 789 F.2d 1492, 1500 n. 6 (11th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); *United States v. Abramson,* 553 F.2d 1164, 1169–70 (8th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *Gambale,* 610 F.Supp. at 1536–37; *Sullivan,* 586 F.Supp. at 1320–23; *but see Massino,* 657 F.Supp. at 107. This is true because:

> It is difficult to see how suppression could be required for noncompliance with § 2518(1)(e) when it is not required for a violation of § 2518(1)(b)(iv). Disclosure of prior applications naming those individuals who are targets of a new investigation necessarily depends on the naming of the targets in the new application. If failure to name target Smith in a wiretap application would not require suppression, the failure to disclose prior applications which Smith was a named interceptee should not require suppression.

*Sullivan,* 586 F.Supp. at 1323; *Gambale,* 610 F.Supp. at 1536–37 (quoting *Sullivan* ). Accordingly, at least where, as here, a violation of subsection (1)(e) is inadvertent, suppression is not justified. *Van Horn,* 789 F.2d at 1500; *Abramson,* 553 F.2d at

1170; *Gambale,* 610 F.Supp. at 1537; *Sullivan,* 586 F.Supp. at 1323; *but see Massino,* 657 F.Supp. at 107 (holding that a prior application might affect the issuing judge's finding of necessity).

In this case, after initially deciding that a *Franks* hearing should be held on defendants' claim of a § 2518(11)(a)(ii) violation, the court indicated that defense counsel could also examine Kottmyer on the reasons the government did not disclose the Bianco and Milano matters or the prior applications concerning all of the individuals named in the Application now at issue. *See* Order dated February 28, 1991, ¶ 1. The government, however, urged reconsideration of whether any testimony by Kottmyer should be required and persuaded the court that defendants had not made the showing contemplated by *Franks* to permit examination concerning the alleged violations of subsections (1)(c) or (e).

The court concludes that the violation of subsection (1)(e) now found was inadvertent, rather than the result of an intentional effort to mislead the court or in reckless disregard of the government's obligations. This conclusion rests on the following facts, among others.

As indicated earlier, Kottmyer asserted in her affidavit that she believed that it was only necessary to disclose prior applications concerning the proposed targets of the roving tap, Russo, Ferrara, and Carrozza. Kottmyer Aff. ¶ 4. This belief, although erroneous, was objectively reasonable. At the time she made her judgment, the requirements of subsection (1)(e) as applied to a roving intercept application had not been addressed in any reported decision. In addition, Kottmyer's interpretation seems supported by the language in *Gambale* that:

> The statute "requires disclosure of only those previous *applications* directed at persons for whom the subsequent application is made." *United States v. Sklarof,* 552 F.2d 1156, 1160 (5th Cir.1977) (emphasis in original) .. [T]here is no requirement that the government disclose previous applications directed at individuals who ... are not named as tar-

gets in the applications for and the orders authorizing surveillance.

610 F.Supp. at 1536. *Gambale* is distinguishable from the present case because prior applications were disclosed for everyone named in the application at issue; the key question in *Gambale* was whether the naming requirement was met. *Id.* Nevertheless, the novelty of the issue and the foregoing language in *Gambale,* among other things, made it reasonable rather than reckless for the government to mistake what was required by subsection (1)(e) in this case.

In addition, it was evident from the Application and Steffens' Affidavit that the government was disclosing prior applications only for those it defined as "principals" and not the others named in its submission. This disclosure is inconsistent with a purported intent to deceive or mislead Judge Nelson. *See Hadfield,* 918 F.2d at 993.

Accordingly, the court finds the failure to disclose all of the necessary prior applications to have been an understandable, innocent error. Thus, suppression for the government's violation of subsection (1)(e) is not justified.

5. Defendants' remaining claims are without merit or are not ripe for resolution.

██ Defendant Patriarca makes an additional claim which is not available to the named targets of the roving intercept warrant, Russo, Carrozza, and Ferrara; Barone and Tortora join in this claim. Patriarca asserts that the government had probable cause to believe that he was implicated in the crimes under investigation, but failed to name him as a target of the roving surveillance or as someone expected to be intercepted. *See* Memorandum in Support of Motion to Suppress All Evidence Derived from Oral Intercept Orders Issued in Case No. M.B.D. 89–1015 dated November 30, 1990 (Docket # 332) at 39. Patriarca argues that the failure to name him, followed by the interception of his conversation pursuant to the roving intercept Order, requires that as to him, and those defendants similarly situated, the intercepted communications be suppressed. *Id.*

This claim is without merit. As explained earlier, subsection (11)(a)(ii) relaxes the requirement that the place to be searched be described in conventional Title III terms by modifying subsections (1)(b)(ii) and (3)(d) when the government shows "such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted." Subsection (11)(a)(ii) does not address or alter the general naming requirement of subsection (1)(b)(iv). Rather, it requires identification of the person to be intercepted as the means of describing the place to be searched. The place to be searched is identified as the location at which a certain person is discussing specified crimes because it has been shown to be impractical to identify that place more specifically. This requirement does not, however, mean that it was improper to intercept Patriarca's communications with Russo, Ferrara, or Carrozza pursuant to the Order in this case.

As one commentator has correctly explained, the subsection (11)(a)(ii) requirement that a roving intercept application identify "the person committing the offense and whose communications are to be intercepted:"

[I]s a more demanding provision than that which governs standard Title III applications and orders: 18 USCS § 2518(1)(b)(iv) requires a standard Title III application, and § 2518(4)(a) requires a standard Title III order, to include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." As this phrase has been interpreted by the Supreme Court, once investigators obtain a wiretap or oral intercept order, they may listen to any conversation that occurs on the targeted phone or location, even if none of the participants in the conversation has been previously identified as a suspect in criminal conduct, even, that is, if all the conversants are "unknowns," so long as they comply with the mandate to minimize the interception of communica-

tions that are not pertinent to the investigation.

The omission of the phrase "if known" from §§ 2518(11)(a)(ii) and 2518(11)(b)(ii), although not explicitly discussed in the Senate Judiciary Committee Report, is obviously intended to limit the availability and use of roving intercepts.... § 2518(11) roving interception orders are permissible only when the application demonstrates that a particular identified individual or individuals can be expected to use numerous telephones or locations to discuss their crimes as a means of evading surveillance. *This more demanding identification requirement precludes investigators from using a roving intercept order as authority to intercept communications between two "unknowns."*

C. Fishman, *Wiretapping and Eavesdropping* § 127.3 (Supp.1990) (emphasis added) (footnotes omitted).

It is, however, permissible for the government to use a roving intercept order to capture criminal conversation between an anticipated participant who has been targeted by name in a roving order and another individual, whether or not the other person was previously known to the government. Thus, the interception of communications at 34 Guild Street involving Patriarca and Russo, Ferrara or Carrozza was permissible.

As indicated in Section IV.4, *supra,* Patriarca may be correct in his claim that he should have been named in the Application and roving Order pursuant to subsections (1)(b)(iv) and (4)(a) as a person "known [to be] committing the offense ... whose communications [were] to be intercepted." § 2518(1)(b)(iv). Once again, this would depend on whether the government had "probable cause to believe that [he] was engaged in the criminal activity under investigation and expect[ed] to intercept [his] conversations." *Donovan,* 429 U.S. at 428, 97 S.Ct. at 668. However, as also indicated previously, a violation of the subsection (1)(b)(iv) naming requirement does not in this case justify suppression. *Id.* at 436–37, 97 S.Ct. at 672–73.

The government was not, however, required to make Patriarca a principal in its roving intercept Application and proposed Order, even if it had a proper basis to do so. Generally, law enforcement officers "are not required to use a particular investigative procedure simply because it is allowed under the law." 1 W. LaFave & J. Israel, *Criminal Procedure,* § 1.2(b) (1984). This principle is especially compelling with regard to electronic surveillance generally and to roving intercept orders particularly. These sensitive investigative techniques should be employed by the government cautiously. As the Supreme Court stated in *Giordano,* "Congress ... [in Title III] evinced the clear intent to make doubly sure that the statutory authority [to intercept communications] be used with restraint." 416 U.S. at 515, 94 S.Ct. at 1826. A finding that suppression is required when someone who could have been targeted in a roving order is overheard, however, would unnecessarily and improperly abet expansive efforts to obtain roving authorizations.

This conclusion is supported by the Supreme Court's recent decision in *Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In *Horton,* the Supreme Court qualified the inadvertent discovery rule as it had been stated in the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). More specifically, in *Horton* the Court stated that if a law enforcement officer:

has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.

*Horton,* 110 S.Ct. at 2309. This principle is also applicable when the search and seizure at issue involves a criminal conversation between a named target of a roving intercept Order and another individual.

The standards suggested by *Horton* are fully satisfied in this case. The Order issued by Judge Nelson was valid. As ex-

plained earlier, it satisfied each of the elements of the warrant clause of the Fourth Amendment, including the requirement of particularity. The Order was also properly issued under the statute. The Application and Steffens' Affidavit were on their face sufficient to establish that it was impractical to specify the place to be searched in the manner usually required by subsections (1)(b)(ii) and (3)(d). *See United States v. Ashley*, 876 F.2d 1069, 1073–74 (1st Cir. 1989). The misstatements and omitted information concerning practicality were not material.

To the extent the FBI properly executed the Order, the interception of Patriarca and others at 34 Guild Street was permissible. Subsection (11)(a)(ii), by its express terms, indicates that a roving order identifying only one target is authorized. It provides that *"the* person committing the offense and whose communications are to be intercepted" must be identified. § 2518(11) (emphasis added). This obviously contemplates the interception of criminal communications between a single individual named in a warrant and others.

To the extent that Patriarca claims that the government did not properly execute the Order, either by failing to minimize the conversations intercepted or by overhearing conversations which did not involve Russo, Ferrara, and Carrozza, his claims are not ripe for resolution. No specific purported imperfections have been identified. If the defendants promptly and precisely identify captured conversations they feel were improperly intercepted under the Order, and if the government then expresses an intention to use that evidence, the court will resolve that more focused dispute.

Patriarca and those defendants similarly situated are not, however, entitled to suppression because they were not made targets of the roving Order in this case.

## V. *Conclusion and Order*

For the reasons stated in this Memorandum, the court concludes:

1. 18 U.S.C. § 2518(11)(a) is constitutional as applied in this case.

2. If the manner in which the Warrant was obtained does not require suppression, the good faith exception to the judicially crafted exclusionary rule which applies to Fourth Amendment violations would operate to defeat defendants' motion to suppress even if the roving intercept provision were deemed unconstitutional.

3. The government's failure to inform the issuing judge of the information it developed on October 27, 1989 concerning the possible use of 34 Guild Street for an imminent Mafia induction ceremony was a violation of § 2518(11)(a)(ii), but suppression is not a proper remedy for this violation because: (1) the government did not intend to mislead the judge and did not act with reckless disregard for its obligations; and (2) if the omitted information had been disclosed, a reasonable judge would nevertheless have issued a roving warrant explicitly or implicitly authorizing electronic surveillance at 34 Guild Street.

4. The government was not, pursuant to § 2518(1)(c), required to include in its Application information concerning its efforts to intercept communications of Nicholas Bianco and Gaetano Milano, and, in any event, suppression would not be justified if a violation of § 2518(1)(c) were found in this case.

5. The government's failure to disclose the prior applications for electronic surveillance for individuals named in the Application in addition to Russo, Ferrara, and Carrozza constituted a violation of § 2518(1)(e), but suppression is not a proper remedy for this violation.

6. The government was not required to name Patriarca, or any defendant similarly situated, as a target or principal in its Application for a roving intercept warrant, and its decision not to do so does not justify suppression.

7. The imperfections in the government's conduct in this case do not individually or cumulatively justify suppression.

Accordingly, defendants' motion to suppress the communications intercepted at 34 Guild Street on October 29, 1989, is hereby DENIED.

APPENDIX 1

In the Matter of the Application of the United States for an Order Authorizing the Interception of Oral Communications

M.B.D. NO.: 89–1015

ORDER AUTHORIZING INTERCEPTION OF ORAL COMMUNICATIONS

Application under penalty of perjury having been made before me by Diane M. Kottmyer, an investigative or law enforcement officer as defined in Section 2510(7) of Title 18, United States Code, for an order authorizing the interception of oral communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matters set forth therein, the Court finds:

1. There is probable cause to believe that JOSEPH A. RUSSO, VINCENT M. FERRARA, ROBERT F. CARROZZA, Gaetano Milano, Louis Failla, John Castagna, Frank Pugliano, John Farrell and others as yet unknown have been and are now committing offenses and are conspiring to commit, and will commit, offenses involving the conducting of one or more illegal gambling businesses in violation of 18 U.S.C. §§ 1955 and 371.

2. There is probable cause to believe that JOSEPH A. RUSSO, VINCENT M. FERRARA, ROBERT F. CARROZZA, Raymond J. Patriarca, Nicholas L. Bianco, Matthew L. Guglielmetti, Jr., Gaetano Milano, Louis Failla, John Castagna, John Farrell, Frank Pugliano, and others as yet unknown have been and are now committing offenses, and are conspiring to commit, and will commit, offenses involving travel and the use of wire facilities in interstate commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management and carrying on of unlawful activities and distributing the proceeds thereof, said unlawful activities being business enterprises involving gambling in violation of state law, and thereafter performing and attempting to perform such acts, in violation of 18 U.S.C. §§ 1952 and 371.

3. There is probable cause to believe that JOSEPH A. RUSSO, VINCENT M. FERRARA, ROBERT F. CARROZZA, Angelo Mercurio, Frank Imbruglia, Frank Pugliano, Gaetano Milano, Louis Failla and others as yet unknown have committed murder in violation of state law for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity and are conspiring to do the same in violation of 18 U.S.C. § 1959.

4. There is probable cause to believe that JOSEPH A. RUSSO, VINCENT M. FERRARA, ROBERT F. CARROZZA, Angelo Mercurio, Frank Imbruglia, Raymond J. Patriarca, Nicholas L. Bianco, Matthew L. Guglielmetti, Jr., Gaetano Milano, Frank Pugliano, Louis Failla, John Castagna, John Farrell, and others as yet unknown are employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and have been and will continue to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity and are conspiring to commit said violations, in violation of 18 U.S.C. § 1962.

5. There is probable cause to believe that particular oral communications made by, directed to, and/or in the presence of JOSEPH A. RUSSO, VINCENT M. FERRARA and ROBERT F. CARROZZA, concerning the subject offenses set forth above, will be obtained through interception of oral communications at various and changing locations. These communications are expected to constitute admissible evidence of the commission of the foregoing offenses. In particular, these oral communications will concern:

(a) The precise nature, scope and extent of the gambling businesses, including the roles of the principals, the identities of the individuals who conduct, manage, supervise, direct or own all or part of the businesses, their length of continuous operation, the methods for settling of accounts and the existence and location of records of the businesses, the dissemination of information relating

to planned illegal gambling events, orders and instructions to subordinates and associates, the distribution of gambling proceeds to and from the State of Massachusetts and elsewhere, the collection of debts, and conversations relating to the administration, conduct and management of the gambling businesses. The communications may also provide evidence of overt acts committed in furtherance of the conspiracy and of the extent of each aider's, abettor's and co-conspirator's knowledge of the criminal activities of the principals.

(b) The precise nature, scope and extent of the interstate travel or use of wire facilities in interstate commerce which are being used to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful gambling businesses and the distribution of the proceeds thereof, and thereafter performing and attempting to perform said acts. The communications may also provide evidence of overt acts committed in furtherance of the conspiracy and of the extent of each aider's, abettor's and co-conspirator's knowledge of the criminal activities of the principals.

(c) The precise manner and means used to commit murder in violation of state law for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, the circumstances surrounding the murder of William Grasso, the identity and role of individuals involved in the planning and carrying out of the murder and the disposal of Grasso's body, and the motive for the murder of Grasso. The communications may also provide evidence of overt acts committed in furtherance of the conspiracy and of the extent of each aider's, abettor's and co-conspirator's knowledge of the criminal activities of the principals.

(d) The precise roles of JOSEPH A. RUSSO, VINCENT M. FERRARA, ROBERT F. CARROZZA, Angelo Mercurio, Frank Imbruglia, Raymond J. Patriarca, Nicholas L. Bianco, Matthew W. Gugliel-

metti, Jr., Gaetano Milano, Frank Pugliano, Louis Failla, John Castagna, John Farrell, and others as yet unknown in the enterprise, including the degree of their conduct or participation, the nature of their association to the enterprise, the degree of the effect of the enterprise on interstate or foreign commerce, the precise details of the management of the enterprise, and the precise details of the pattern of the racketeering activity.

6. It is not practical to specify each of the locations at which such oral communications will be intercepted in connection with the commission of the above stated offenses.

7. Normal investigative techniques either have been tried without success or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Federal Bureau of Investigation are authorized, pursuant to an application authorized by the Acting Assistant Attorney General for the Criminal Division, United States Department of Justice, the Honorable John C. Keeney, to intercept oral communications made by, directed to, and/or in the presence of JOSEPH A. RUSSO, VINCENT M. FERRARA, and/or ROBERT F. CARROZZA, concerning the above described offenses, at such various and changing locations.

Such interceptions shall not automatically terminate when the types of communications described above in paragraph (5) have first been obtained, but shall continue until communications are intercepted that reveal the manner in which RUSSO, FERRARA, CARROZZA, their listed co-conspirators and others as yet unknown, participate in the specified offenses, and that reveal the identities of RUSSO'S, FERRARA's, and CARROZZA's co-conspirators, their places of operation and the nature of the conspiracies involved therein, or for a period of thirty (30) days, whichever is earlier; pursuant to Section 2518(5) of Title 18, United States Code, the time set forth in this Order shall run from the earlier of the day on which the investigative or law enforcement

officer shall first begin to conduct the interception or ten days from the date of this Order.

It is further ORDERED that Special Agents of the Federal Bureau of Investigation are authorized to enter premises surreptitiously for the purposes of installing, maintaining, repairing and removing any electronic oral interception devices utilized pursuant to the authority granted by this order, providing where feasible, Applicant shall notify the Court in advance of such surreptitious entry. Where notification in advance is not feasible, Applicant shall notify the court as soon as possible after the fact of the location and circumstances of the entry.

It is further ORDERED that this authorization to intercept oral communications shall be executed as soon as practicable after signing of this Order and shall be conducted in such a way as to minimize personal and privileged communications and communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code. No interception of oral communications shall be conducted unless it is determined through physical surveillance or by other means that one or more of the named interceptees is present when the conversation to be intercepted is taking place. This authorization must terminate upon attainment of the authorized objective or, in any event, at the end of thirty (30) days, measured from the earlier of the day on which an investigative or law enforcement officer first begins to conduct the interception or ten days from the date of the Order.

It is further Ordered, pursuant to 18 U.S.C. § 2518(8)(d), that no inventory or return of the results of this electronic surveillance and interception be made before ninety (90) days from the date of the expiration of this Order and any extension thereof and that upon any *ex parte* showing of good cause to a judge of competent jurisdiction, the service of the above-mentioned inventory or return be postponed for a further reasonable period of time.

It is further ORDERED that Applicant shall provide the Court with a report on or about the seventh (7th), fourteenth (14th), twenty-first (21st) and twenty-eighth (28th) days following the date of this Order showing what progress has been made toward achievement of the authorized objective and the need for continued interception.

/s/ David S. Nelson
United States District Judge

Date: October 27, 1989

Time: 6:25 p.m.

### APPENDIX 2

18 U.S.C. § 2518(11) provides that:

The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to the specification of the facilities from which, or the place where, the communication is to be intercepted do not apply if—

(a) in the case of an application with respect to the interception of an oral communication—

(i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;

(ii) the application contains a full and complete statement as to why such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted; and

(iii) the judge finds that such specification is not practical; and

(b) in the case of an application with respect to a wire or electronic communication—

(i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;

(ii) the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a

showing of a purpose, on the part of that person, to thwart interception by changing facilities; and

(iii) the judge finds that such purpose has been adequately shown.

Therefore, subsections (1)(b)(ii) and (3)(d) now provide:

(1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including ... (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted

\*    \*    \*    \*    \*    \*

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that—

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.